[Cite as *State v. Wrasman*, 2020-Ohio-6887.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 2-20-03

    v.

BENJAMIN R. WRASMAN,             O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Auglaize County Municipal Court
Trial Court No. 2019 CRB 0231

Judgment Affirmed

Date of Decision:  December 28, 2020

APPEARANCES:

    *Nick A. Catania* for Appellant

    *Laia Zink* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Benjamin R. Wrasman ("Wrasman"), appeals the January 28, 2020 judgment of sentence of the Auglaize County Municipal Court. For the reasons that follow, we affirm.

{¶2} This case arises from a February 2019 incident between Wrasman and his minor stepdaughter, K.H. According to K.H., on February 3, 2019, Wrasman brushed his hand against her breast and later touched her buttocks while giving her a hug. While the touching made K.H. uncomfortable, she initially believed that it was accidental. However, K.H. later reconsidered her belief that the touching was accidental after Wrasman apologized to her many times over the course of the next day and a half and engaged in other questionable behavior, such as requesting that K.H. not talk about the incident again. K.H. told her mother, Kimberly Wrasman ("Kimberly"), about the incident, which Kimberly then reported to law enforcement authorities.

{¶3} On April 1, 2019, a complaint was filed in the trial court charging Wrasman with one count of sexual imposition in violation of R.C. 2907.06(A)(1), a third-degree misdemeanor. (Doc. No. 7). On June 19, 2019, Wrasman appeared for arraignment and entered a plea of not guilty. (Doc. No. 21).

{¶4} A jury trial was held on January 27, 2020. After deliberations, the jury found Wrasman guilty as charged. (Doc. No. 85). The trial court proceeded

immediately to sentencing. The trial court sentenced Wrasman to 60 days in jail and ordered that Wrasman's jail sentence be served concurrently to a 9-year prison sentence imposed in Logan County case number CR 19 02 0054. (Doc. No. 86). *See State v. Wrasman*, 3d Dist. Logan No. 8-19-36, 2019-Ohio-5299, ¶ 2-3. Furthermore, Wrasman was designated as a Tier I sex offender. (Doc. No. 86). The trial court filed its judgment entry of sentence on January 28, 2020. (*Id.*).

{¶5} On February 12, 2020, Wrasman filed a notice of appeal. (Doc. No. 93). He raises two assignments of error for our review.

**Assignment of Error No. I**

**The trial court's decision finding the defendant-appellant guilty was against the manifest weight of the evidence.**

{¶6} In his first assignment of error, Wrasman argues that his sexual-imposition conviction is against the manifest weight of the evidence.

{¶7} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on

matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶8} In this case, Wrasman was charged with one count of sexual imposition in violation of R.C. 2907.06(A)(1). R.C. 2907.06(A)(1) provides in relevant part that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person, * * * or is reckless in that regard." "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶9} To obtain a conviction for sexual imposition in violation of R.C. 2907.06(A)(1), the State must prove either that the defendant knew that the sexual contact was offensive or that the defendant was reckless with respect to whether the sexual contact was offensive. Thus, the culpable mental state for a violation of R.C. 2907.06(A)(1) is either knowledge or recklessness. *See State v. Courie*, 11th Dist. Ashtabula No. 2014-A-0043, 2015-Ohio-2894, ¶ 40-42. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a

-4-

particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.* "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶10} In addition, "[t]he definition of sexual contact includes an express culpability requirement of 'purpose.'" *State v. Curtis*, 12th Dist. Butler No. CA2008-01-008, 2009-Ohio-192, ¶ 90, citing R.C. 2907.01(B) and *State v. Mundy*, 99 Ohio App.3d 275, 295 (2d Dist.1994); *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, ¶ 23-28. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "'[T]here is no requirement that there be direct testimony regarding sexual arousal or gratification.'" *State v. Young*, 12th Dist. Butler No. CA2018-03-047, 2019-Ohio-912, ¶ 47, quoting *State v. English*, 12th

Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 69. Rather, "'[w]hether the touching was performed for the purpose of sexual arousal or gratification is a question of fact to be inferred from the type, nature, and circumstances of the contact.'" *Id.*, quoting *State v. Gesell*, 12th Dist. Butler No. CA2005-08-367, 2006-Ohio-3621, ¶ 25.

{¶11} At trial, the State offered the testimony of the alleged victim, K.H. K.H. testified that on February 3, 2019, she was with her sister, M.H., and Wrasman after Kimberly left the house. (Jan. 27, 2020 Tr. at 49). According to K.H., she was sitting on a loveseat watching a show and playing a game on her phone. (*Id.* at 50). M.H. was in a different room. K.H. stated that Wrasman sat down next to her on the loveseat and began watching whatever she was doing on her phone at the time. She testified that Wrasman "leaned really close to [her]," which she thought was odd, but that she was not alarmed because "he was just watching the show [she] was looking at that point." (*Id.*). Soon, however, Wrasman "leaned really close and then reached across [K.H.'s body] * * * and he reached across and started rubbing [her] arm." (*Id.*). K.H. testified that after Wrasman stopped rubbing her arm, "[h]e pulled his hand away and brushed [her] breast." (*Id.* at 51). K.H. stated that Wrasman apologized after he brushed her breast and that she "said [that it was] ok because [she] assume[d] it [was] an accident." (*Id.*). According to K.H., after this incident,

Wrasman kept "leaning close." (*Id.*). K.H. testified that while they were sitting on the loveseat, Wrasman "asked her multiple times if [she] was ok." (*Id.* at 62).

{¶12} K.H. testified that she eventually got up from the loveseat because she and M.H. had to leave the house to go to a school function. (*Id.* at 51). She stated that when she got up, Wrasman gave her a hug. (*Id.*). K.H. testified that during the hug, Wrasman "touched lower than he should have" and that he "hugged [her] like he would have hugged [Kimberly], lower on [her] very lower back." (*Id.*). K.H. stated that Wrasman's fingers were placed at the top of her buttocks and over her clothes. (*Id.* at 52-53). She said that the hug "made [her] nervous at first" but that she "thought maybe it was an accident and * * * didn't say anything about it." (*Id.* at 52). K.H. testified that she then went to get M.H. so that they could leave but that Wrasman called her back into the room. (*Id.* at 53). She stated that Wrasman then "asked if it was ok and [she] said hugs are fine, and then he said, 'Just hugs?' and [she] was kind of wondering what else he could have meant. [A]nd then he said ok, and * * * [she and M.H.] left the house." (*Id.* at 53-54). K.H. stated that in the year that she had known Wrasman, Wrasman had given her hugs, but he had never done anything like "the hugging and the reach across" her breast. (*Id.* at 57, 64, 66).

{¶13} K.H. testified that, later that evening, she, Wrasman, and the rest of her family attended a birthday party at her grandmother's house. She stated that during the party, she went into a bedroom to retrieve a toy for her younger brother.

(*Id.* at 54). K.H. testified that Wrasman followed her into the bedroom. (*Id.*). According to K.H., Wrasman asked her whether she had told anybody about the earlier incidents, and he maintained that it "was a big misunderstanding." (*Id.*). K.H. testified that she "told him that [she] told [M.H.] and then [she] left the room." (*Id.*). K.H. stated that she went into the bedroom a second time during the party and that Wrasman again followed her into the bedroom. (*Id.* at 55). She testified that Wrasman "asked what all [she] had told [M.H.] and [she] said [she did not] know and had to push * * * past him to get out of the room * * *." (*Id.*). K.H. stated that after Wrasman cornered her in the bedroom for the second time, she "felt that he meant more by the touching * * * [a]nd * * * [she] was scared." (*Id.* at 56). She conceded that she initially believed that the touching was accidental and that she did not start to think that anything was amiss until Wrasman started apologizing. (*Id.* at 64-66).

{¶14} K.H. testified that after the birthday party, she returned home and started working on homework in her bedroom. (Jan. 27, 2020 Tr. at 56-57). According to K.H., Wrasman returned home shortly thereafter and "ran in the house before [Kimberly] was inside and * * * came up to [her] bedroom and started talking to [her]." (*Id.* at 57). She stated that Wrasman once again apologized and insisted that it was a "big misunderstanding." (*Id.*). K.H. testified that Wrasman said that it would not happen again and that he asked her if she "wanted him to pack up his

bags and leave." (*Id.*). K.H. stated that Wrasman also requested that they "not talk about this ever again." (*Id.*). However, the following morning, Wrasman sent K.H. a text message in which he asked, "Are you ok?" (*Id.* at 59); (States' Ex. 2). K.H. responded that she was "fine," and she asked Wrasman to explain why he kept asking that question. (State's Ex. 2). Wrasman replied, "I feel awful," which K.H. interpreted as Wrasman's response to "the whole touching situation." (Jan. 27, 2020 Tr. at 63); (State's Ex. 2).

{¶15} Finally, K.H. testified that on the day after the incident, she went up to her bedroom to pack her bags because she and M.H. were going to stay the night at their father's house. (Jan. 27, 2020 Tr. at 58). Kimberly was with her. (*Id.*). According to K.H., Wrasman "came up to [her bedroom][,] not knowing [Kimberly] was in there[,] and said 'hey babe' and opened the door." (*Id.*). K.H. testified that Wrasman "never calls [her] that" and that Wrasman "looked at [Kimberly] and said 'not you.'" (*Id.*). K.H. stated that Wrasman then "started trying to talk to [her]." (*Id.*).

{¶16} The State also offered Kimberly's testimony. Kimberly testified that on February 4, 2019, K.H. came to her and told her that Wrasman "had touched her inappropriately and made her feel uncomfortable." (*Id.* at 76). Kimberly stated that she confronted Wrasman about the incident. (*Id.* at 78). She testified that Wrasman "did not directly come out and admit anything" or give her specifics about what

happened between himself and K.H. (*Id.* at 80, 92). Kimberly stated that Wrasman insisted that "the story had been misconstrued." (*Id.* at 80).

{¶17} According to Kimberly, Wrasman "got very anxious and * * * got up and left." (*Id.* at 79). She testified that before Wrasman left, he "told [her] that he couldn't live with what he had done and that [he] was going to kill himself." (*Id.* at 90). She stated that Wrasman "took his gun with him before he left" and that she believed that Wrasman was suicidal that day. (*Id.* at 90, 92). Kimberly testified that while she did not have any concerns about Wrasman's mental wellbeing during the course of their two-year relationship, she was aware that Wrasman suffered from anxiety. (*Id.* at 78, 92). She stated that this was the only mental health issue of which she was aware and that she believed that Wrasman had been prescribed medication "for anxiety and sleep." (*Id.* at 92).

{¶18} In addition, Kimberly identified a series of text messages that she exchanged with Wrasman in the hours and days after he left their house. (*Id.* at 80-81, 87-91); (State's Exs. 3-8). Throughout these text messages, Wrasman apologizes to Kimberly and implores Kimberly to move on from him. (State's Exs. 3-5). Wrasman also states that "there's nothing else for [him] to do but end it," that he "will never forgive [himself]," and that he "will never be able to live with [himself] for what [he has] done." (State's Exs. 5-6). Wrasman also asks repeatedly whether K.H. is "going to be ok" and whether K.H. is "doing any better." (State's

Exs. 7-8). Finally, Wrasman requests that Kimberly tell K.H. that "there is nothing wrong with her and she didn't do anything wrong" and that Kimberly stop K.H. from "blam[ing] herself for this." (State's Ex. 5).

{¶19} Wrasman testified in his own behalf. Wrasman stated that prior to February 3, 2019, he had a good relationship with K.H. and an appropriate physical relationship with all of Kimberly's children. (Jan. 27, 2020 Tr. at 109-110). Wrasman stated that on February 3, 2019, he was sitting next to K.H. on the loveseat as K.H. was playing a logic game on her phone. (*Id.* at 110). He explained that many members of the family played the same logic game and that they would often "sit beside each other and play the game * * * and kind of lean over and help each other." (*Id.*). Wrasman testified that, consistent with this practice, he "reach[ed] out to touch the screen on [K.H.'s] phone." (*Id.*). He stated that, as he reached out to touch K.H.'s phone, he "accidentally touched [K.H.'s] breast" with the back of his hand. (*Id.*). Wrasman testified that he apologized to K.H., and he denied that he intended to touch K.H.'s breast. (*Id.* at 110-111). He also denied receiving any sexual gratification from touching K.H.'s breast. (*Id.* at 111). With respect to K.H.'s allegation that Wrasman rubbed her arm before he touched her breast, Wrasman acknowledged that he was "leaning up closer and * * * just kind of rubbed [K.H.'s] * * * left arm with [his] right hand." (*Id.* at 121). However, he suggested that it was "just maybe a sign of affection." (*Id.* at 120).

-11-

{¶20} Wrasman recalled that he felt awkward about touching K.H.'s breast and that it made him uncomfortable. (*Id.*). Moreover, he admitted that the hug between himself and K.H. was "an awkward hug," but he stated that he "didn't touch [K.H.'s] buttocks or intend to in any way." (*Id.*). Wrasman consistently denied that he touched K.H. in an inappropriate manner. (*See id.* at 122).

{¶21} Much of Wrasman's testimony was directed toward explaining his behavior after the incident, specifically his apologies and threats of suicide. Wrasman testified that, years earlier, he had been diagnosed with major depression and anxiety and that he had been previously treated for schizophrenia. (*Id.* at 111-112). According to Wrasman, these mental health issues, combined with substance abuse issues, resulted in feelings of helplessness and worthlessness, which led him to twice contemplate suicide in the 2000s. (*Id.* at 112-113).

{¶22} Wrasman testified that by the time he met Kimberly, he was medicated and had been sober for several years. (Jan. 27, 2020 Tr. at 113). However, according to Wrasman, after Kimberly confronted him about K.H.'s allegations, his mental condition deteriorated rapidly. Wrasman testified that although he "never believed [he] did something wrong," he was "concerned about how it might be perceived" and "afraid that everything that [he] had worked so hard to put together in [his] life, [such as] [his] sobriety, [his] marriage, [and] [his] relationship with [his] family, was at risk." (*Id.* at 114-115). Wrasman testified that these concerns

drove him to leave the house without his medications. (*Id.* at 115). He stated that he was "scared and lost and * * * felt like [he] was going to lose [his] whole family and * * * didn't feel like living after that." (*Id.*). According to Wrasman, he purchased some alcohol and "drank as much alcohol as [he] could stomach to get * * * the courage" to take his own life. (*Id.* at 117). Wrasman testified that his mental health issues "[a]bsolutely" had something to do with how he responded to K.H.'s allegations and that his actions were not "because [he] believed [he] did something wrong." (*Id.* at 116). Instead, Wrasman asserted that he acted the way he did "because of [his] family falling apart." (*Id.*).

{¶23} Finally, with respect to his numerous apologies, Wrasman reiterated that while he did not believe that he did anything wrong, he was still concerned that he might have inadvertently hurt K.H. Wrasman testified that he "worri[es] about everything" and that he "has always worried about things." (*Id.* at 114-115). He stated that "the anxiety really drove [him] to worry about things" and that he thought that his schizophrenia "is what contributed to [him] asking repeatedly if [K.H. was] ok." (*Id.* at 122-123).

{¶24} In claiming that his sexual-imposition conviction is against the manifest weight of the evidence, Wrasman does not argue that the evidence weighs against a finding that he touched K.H.'s breast and buttocks. Furthermore, Wrasman does not contend that the touching was not offensive to K.H., and

Wrasman does not argue that he did not know that the touching was offensive to K.H., or that he was not reckless in that regard. Instead, Wrasman argues that "no evidence was ever presented that the [touching] was done for anyone's sexual gratification." (Appellant's Brief at 5). He maintains that "[t]he only parties involved and present agreed that [the touching] was accidental" and that "[a]ll the evidence shows an accidental slip of the hand, not a purposeful and intentional sexual touching." (*Id.* at 6).

{¶25} Wrasman is correct insofar as the State did not present any direct testimony that Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification. He is also correct that he himself described the touching as accidental and that K.H. also believed that the touching was accidental—a belief that K.H. reconsidered in light of Wrasman's subsequent behavior. Nonetheless, we conclude that the State presented plenty of evidence from which the jury could infer that Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification.

{¶26} First, Wrasman's other conduct beyond touching K.H.'s breast and buttocks suggests that he may have desired to press his relationship with K.H. past the boundaries of an appropriate relationship between stepfather and stepdaughter. Before he touched K.H.'s breast and buttocks, Wrasman nestled close to K.H., which K.H. thought was "odd," and began rubbing her arm. (Jan. 27, 2020 Tr. at

50). Furthermore, on the day after the incident, Wrasman, apparently ignorant of the fact that Kimberly was with K.H., opened the door to K.H.'s bedroom and said, "Hey babe." (*Id.* at 58). Although Wrasman's testimony portrayed this conduct as innocuous, when the touching of K.H.'s breast and buttocks is viewed in light of this conduct, it becomes more reasonable to conclude that the touching was sexually motivated.

{¶27} In addition, Wrasman's numerous apologies and suicide threats further support an inference that Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification. "'[C]ourts in Ohio * * * have affirmed that apologies constitute a "consciousness of guilt."'" *State v. Pryor*, 5th Dist. Stark No. 2013CA00016, 2013-Ohio-5693, ¶ 34, quoting *State v. Tvaroch*, 11th Dist. Trumbull No. 2012-T-0008, 2012-Ohio-5836, ¶ 25. In addition, "[c]ourts have held that the threat of suicide falls * * * under the definition of consciousness of guilt * * *." *State v. Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 45, citing *Tvaroch* at ¶ 26. "'[E]vidence of consciousness of guilt * * * [is evidence] of guilt itself.'" *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, ¶ 72, quoting *State v. Williams*, 79 Ohio St.3d 1, 11 (1997) and citing *State v. Moore*, 7th Dist. Mahoning No. 12 MA 8, 2013-Ohio-1435, ¶ 132. Furthermore, behaviors indicating a defendant's consciousness of guilt are among the surrounding facts or circumstances that the trier of fact can use to infer the defendant's purpose. *See*

*State v. Tichaona*, 11th Dist. Portage No. 2010-P-0090, 2011-Ohio-6001, ¶ 41-42; *State v. Collins*, 8th Dist. Cuyahoga No. 95422, 2011-Ohio-4808, ¶ 34, 39-41; *State v. Mitchell*, 10th Dist. Franklin No. 10AP-756, 2011-Ohio-3818, ¶ 29; *State v. January*, 2d Dist. Clark Nos. 09-CA-52 and 09-CA-53, 2010-Ohio-2837, ¶ 14-15.

**{¶28}** While Wrasman tried at trial to account for his behavior by testifying that his apologies and suicide threats were the product of his mental illnesses rather than an expression of his guilt over having touched K.H. inappropriately, the jury, as the trier of fact, was free to reject Wrasman's explanation. *See State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24 ("'[T]he jury is free to believe all, part, or none of the testimony of each witness.'"), quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. In addition to Wrasman's explanation, the jury was presented with evidence of the excessive number of Wrasman's apologies, Wrasman's persistence in apologizing to K.H., and other aspects of his apologies and suicide threats, including that he twice confronted K.H. in a bedroom, that he demanded to know whether K.H. told anyone about the touching, and that he requested that K.H. not talk about the incident again. In light of this evidence, we conclude that it would not have been unreasonable for the jury to disbelieve Wrasman's explanation and instead determine that Wrasman's behaviors reflected the guilt he felt for having touched K.H. for the purpose of sexual gratification.

{¶29} Ultimately, reversals on manifest-weight grounds are reserved only for "exceptional cases, where the evidence 'weighs heavily against the conviction[.]'" *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119. Since the State presented ample evidence supporting an inference that Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification, this is not such an exceptional case. Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Wrasman's sexual-imposition conviction must be reversed.

{¶30} Wrasman's first assignment of error is overruled.

### Assignment of Error No. II

**The attorney retained to represent the defendant-appellant in this case did not provide effective assistance of counsel.**

{¶31} In his second assignment of error, Wrasman argues that he received ineffective assistance of counsel.

{¶32} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show that counsel's conduct was deficient

or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶33} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶34} Wrasman advances five separate arguments for why his trial counsel was ineffective. First, Wrasman argues that his trial counsel was ineffective for failing to object to a portion of the State's closing argument in which the prosecutor characterized Wrasman's conduct as "grooming." (Appellant's Brief at 9-10). Wrasman argues that this comment was inappropriate and prejudicial because there

was no evidence addressing whether his conduct was "grooming" behavior, and the prosecutor's comment "declare[d] [her] individual opinion or belief that [he was] guilty, in such a manner that the jury [could have] underst[ood] such opinion or belief to be based upon something which the prosecutor kn[ew] [was] outside the evidence." (*Id.* at 9).

{¶35} With respect to this argument, we conclude that Wrasman has not demonstrated that he received ineffective assistance of counsel because he has failed to establish that his trial counsel's performance was deficient or unreasonable. Initially, we note that, contrary to Wrasman's assertion, the issue of "grooming" was in fact raised during the presentation of evidence. During cross-examination, the prosecutor asked whether Wrasman "started self-medicating because [K.H.] denied [his] grooming of her?" (Jan. 27, 2020 Tr. at 123). Wrasman responded, "Absolutely not." (*Id.*). Therefore, in her closing argument, the prosecutor did not improperly invoke an "opinion or belief" that was based on evidence outside the record. Moreover, at the beginning of her closing argument, Wrasman's trial counsel addressed the prosecutor's comment and countered that the evidence did not support that Wrasman was "grooming" K.H. because K.H. had "known [Wrasman] for two years and [she] said * * * [nothing] like this ha[d] ever happened before." (*Id.* at 129). She argued that if Wrasman had been "grooming" K.H., "there would have been little touches, little suggestions, and many other things * * *."

(*Id.*). Thus, the record is clear that Wrasman's trial counsel acted swiftly to protect Wrasman's interests by refuting the prosecutor's characterization of his behavior.

**{¶36}** Next, Wrasman argues that his trial counsel was ineffective for failing to call an expert witness to testify about his mental illnesses. (Appellant's Brief at 10). Wrasman maintains that his trial counsel should have known that his mental health status "was going to be a major issue of contention and that an expert would be needed to relate to the jury how [his] mental health problems could have explained his obsessive apologies and accounted for his suicidal comments afterwards which the State used as consciousness of guilt." (*Id.*).

**{¶37}** As with Wrasman's first argument, we conclude that Wrasman has not demonstrated that he received ineffective assistance of counsel because he has failed to establish that his trial counsel's performance was deficient or unreasonable. "Generally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy." *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 43, citing *State v. Coleman*, 45 Ohio St.3d 298, 307-308 (1989) and *State v. Tobert*, 1st Dist. Hamilton No. C-010700, 2003-Ohio-675, ¶ 19. While we are wary of engaging in improper speculation as to why Wrasman's trial counsel might have eschewed expert testimony, we can conceive of several reasons why she might have done so. First, as the record is silent on the matter, it is possible that Wrasman's trial counsel

investigated the possibility of presenting expert testimony but found no expert able or willing to testify. *See State v. Cook*, 3d Dist. Union No. 14-19-26, 2020-Ohio-3411, ¶ 106.

{¶38} Additionally, as the State notes, Wrasman's trial counsel also represented him in the Logan County case, where Wrasman was examined by a forensic psychiatrist and deemed competent to stand trial. (*See* Jan. 27, 2020 Tr. at 119-120). Accordingly, because Wrasman's trial counsel was familiar with Wrasman and with his mental health issues, it is possible that she declined to pursue expert testimony either because she knew that it would be a vain effort or because she believed that such testimony would actually undermine his defense. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 244 ("The decision not to seek expert testimony is often tactical '"because such an expert might uncover evidence that further inculpates the defendant."'"), quoting *State v. Krzywkowski*, 8th Dist. Cuyahoga Nos. 83599, 83842 and 84056, 2004-Ohio-5966, ¶ 22, quoting *State v. Glover*, 12th Dist. Clermont No. CA2001-12-102, 2002-Ohio-6392, ¶ 25. Finally, it is possible that Wrasman's trial counsel concluded that Wrasman's own testimony would be the best evidence of his mental health issues and of how those issues factored into his apologies and suicide threats. Wrasman has the burden of showing that his trial counsel's decision not to call an expert witness was not a sound trial strategy prompted by reasonable professional judgment, and Wrasman's

-21-

conclusory statements that his trial counsel's decision was unreasonable are not enough to carry that burden.

{¶39} In addition, Wrasman argues that his trial counsel was ineffective for failing to object to K.H.'s testimony that he was unaware that she was in her bedroom with Kimberly when he said, "Hey babe." (Appellant's Brief at 10). He argues that this testimony was "clearly improper" because K.H. was "testifying to [his] internal thoughts that she could not have known and no further testimony explain[ed] how K.H. could have possibly known whether or not he knew [Kimberly] was in her bedroom." (*Id.* at 10-11).

{¶40} Regarding this argument, we conclude that even if Wrasman's trial counsel's performance was deficient or unreasonable, Wrasman has not demonstrated that he received ineffective assistance of counsel because he has failed to establish that he was prejudiced by this testimony. As is clear from our analysis of Wrasman's first assignment of error, we believe that this comment is relevant to determining whether Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification. Nevertheless, this testimony was but a small piece of the State's entire case against Wrasman, and in our view, it is among the least compelling evidence supporting an inference that Wrasman touched K.H. for purposes of sexual gratification. Even when this testimony is set aside, the evidence supporting the necessary inference, specifically K.H.'s testimony that Wrasman sat

very close to her and rubbed her arm prior to the offensive touching and the evidence indicating Wrasman's consciousness of guilt, is substantial. Therefore, we cannot say that Wrasman was prejudiced because he has not established that there is a reasonable probability that the jury would have drawn a contrary inference about his sexual motivations had this testimony been excluded.

{¶41} Furthermore, Wrasman argues that his trial counsel was ineffective for failing to impeach K.H. (Appellant's Brief at 11). He notes that K.H.'s testimony that he touched her buttocks conflicted with a statement K.H. made to Children Services, in which K.H. "states that it wasn't a normal hug as his hand[s] were lower, not actually touching her butt, but close." (*Id.*). Wrasman contends that while K.H.'s earlier inconsistent statement was in his trial counsel's possession, his trial counsel "failed to impeach or even question K.H. about this inconsistency." (*Id.*).

{¶42} With respect to this argument, we conclude that Wrasman can show neither deficient performance nor prejudice because K.H.'s allegedly inconsistent statement is not in the record before us. Although Wrasman attached a copy of K.H.'s statement to his appellate brief, the statement was not admitted as evidence at Wrasman's trial or otherwise entered upon the record. Therefore, because the statement is not actually part of the record, we cannot consider it. "'When an allegation of ineffective assistance of counsel is based upon material that is not part

of the record, the merits of the argument cannot be addressed.'" *State v. Kring*, 10th Dist. Franklin No. 07AP-610, 2008-Ohio-3290, ¶ 60, quoting *State v. Barnett*, 7th Dist. Jefferson No. 06-JE-23, 2008-Ohio-1546, ¶ 130. As a result, we are unable to determine, and Wrasman is unable to demonstrate, that his trial counsel's failure to use K.H.'s statement to impeach her testimony constituted ineffective assistance of counsel. *See State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 142 (holding that defendant could not demonstrate ineffective assistance of counsel because prior inconsistent statements, which defendant claimed should have been used to impeach a witness, were not in the record); *Kring* at ¶ 59-60 (where a witness's allegedly inconsistent deposition testimony was not in the record, court could not consider defendant's claim that trial counsel was ineffective for failing to "directly use" deposition to impeach the witness's testimony); *State v. Lane*, 2d Dist. Greene No. 94-CA-8, 1995 WL 39300, *1 (Feb. 3, 1995) (concluding that claim of ineffective assistance of counsel on direct appeal was nonviable because "the prior alleged inconsistent statements * * * w[ere] never made part of the record * * * [and] the record does not show that there were actually inconsistencies" or that the trial would have ended differently if the witness had been impeached with the statements).

{¶43} Finally, Wrasman argues that his trial counsel was ineffective for failing to request that the jury be instructed on the definition of "purpose."

-24-

(Appellant's Brief at 9). He notes that "sexual contact" specifically requires that the contact be done "for the purpose of sexual gratification" and it "was never spelled out to the jury [that] they needed to find [a] specific intention [of sexual gratification]." (*Id.*). Wrasman argues that because "[t]here was no direct evidence about the purpose of the touching being for any kind of sexual gratification," the jury would likely have acquitted him if it had been "properly instructed about the definition of purposeful." (*Id.*).

{¶44} In response to Wrasman's argument, the State notes that Wrasman "fail[ed] to note any case law requiring 'purpose' to be defined in a sexual imposition case." (Appellee's Brief at 8). While the State is correct that Wrasman failed to cite any authority for the proposition that the jury in a sexual-imposition case must be instructed on the definition of "purpose," as we have already noted, "[t]he definition of sexual contact includes an express culpability requirement of 'purpose.'" *Curtis*, 2009-Ohio-192, at ¶ 90; *Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, at ¶ 23-28. "'As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged, and, where specific intent or culpability is an essential element of the offense, a trial court's failure to instruct on that mental element constitutes error.'" *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, ¶ 17, quoting *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). Therefore, because "sexual contact" is an

element of the offense of sexual imposition and "purpose" is an express element of "sexual contact," juries in sexual-imposition trials should be instructed on the definition of "purpose." *Mundy*, 99 Ohio App.3d at 291-295.

{¶45} The State further requests that we look past Wrasman's trial counsel's failure to ensure that the jury was instructed on the definition of "purpose" because "[t]he Ohio Jury Instructions for sexual imposition do[] not define 'purpose' as part of the sexual contact definition." (Appellee's Brief at 8). Indeed, the Ohio Jury Instructions for the offense of sexual imposition do not direct trial courts to instruct juries on the definition of "purpose" when defining "sexual contact." *See Ohio Jury Instructions*, CR Section 507.06 (Rev. Jan. 23, 2010). Yet, in the section of the Ohio Jury Instructions covering the definitions of various sexual terms, trial courts are advised that they "should instruct the jury that the applicable mens rea for sexual contact is purposely." *Ohio Jury Instructions*, CR Section 417.39 (Rev. Dec. 9, 2017), citing *Dunlap*. Accordingly, while the State's observation is technically correct, the Ohio Jury Instructions as a whole do in fact recommend that trial courts define "purpose" when defining "sexual contact."

{¶46} In light of the foregoing, we conclude that the jury should have been instructed on the definition of "purpose," and we assume that Wrasman's trial counsel performed deficiently by failing to ensure that the jury was properly instructed. However, this does not necessarily mean that Wrasman received

ineffective assistance of counsel because failure to instruct on each element of an offense is not prejudicial per se. *See Wamsley* at ¶ 17, citing *Adams* at paragraph two of the syllabus. Instead, "an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *Id.*, citing *Adams* at paragraph three of the syllabus.

{¶47} After reviewing the jury instructions as a whole and the entire record, we conclude that Wrasman has failed to demonstrate that he was prejudiced by the omission of the definition of "purpose" from the jury instructions. To begin, the jury was not totally ignorant of the fact that sexual imposition required proof of the defendant's "purpose." The jury was instructed on the definition of "sexual contact," including the requirement that the contact be "for the purpose of sexual[] arous[al] or gratif[ication]." (Feb. 27, 2020 Tr. at 134).

{¶48} Furthermore, the jury was not left without any guidance whatsoever as to the meaning of "purpose." Elsewhere in the jury instructions, the trial court stated that "[w]here a term has not been defined, [the jury] must give that term [its] common and ordinary meaning." (*Id.* at 139). As one judge of the Tenth District Court of Appeals observed in dissent, "the ordinary common-use definition of the word purpose is very similar to the statutory definition * * *." *State v. Woods*, 10th Dist. Franklin No. 15AP-24, 2016-Ohio-661, ¶ 23-25 (Klatt, J., dissenting) (citing

various "lay definitions" of "purpose"); *see State v. Blackburn*, 11th Dist. Trumbull No. 2001-T-0052, 2003-Ohio-605, ¶ 18-20; *State v. Davidson*, 8th Dist. Cuyahoga No. 38221, 1979 WL 209889, *3-4 (Jan. 25, 1979). Although the jury could not have resorted to any dictionary for the definition of "purpose" during the course of its deliberations, in order to understand the common and ordinary meaning of "purpose," it would not have been necessary for the jury to look to the dictionary. The common and ordinary meaning of a word exists independently of dictionaries and not by reason of its inclusion in them. Where a word is one regularly and normally used by laypersons, the common and ordinary meaning of the word resides first in the people who use the word during the course of their everyday lives, such as the jurors in this case. In general, a dictionary definition simply reflects the common and ordinary meaning already ascribed to the word. Again, the common meaning of "purpose" is consistent with the statutory definition. *Woods* at ¶ 29 (Klatt, J., dissenting). Thus, the jury needed only to think of its understanding of the common and ordinary meaning of "purpose" in order to understand the meaning of the word as it is used in the definition of "sexual contact."

{¶49} Finally, and perhaps most importantly, from the evidence presented at trial, it is far from clear that the jury would have found Wrasman not guilty of sexual imposition if it had been instructed on the definition of "purpose." In an analogous case, the Twelfth District Court of Appeals "conclude[d] that the trial court did not

substantially prejudice appellant in failing to provide the jury with the definition of purpose as an element of sexual contact." *Curtis*, 2009-Ohio-192, at ¶ 91. There, the court observed:

> In addressing a similar argument, the Eleventh District Court of Appeals determined that a trial court's failure to instruct a jury that a defendant's sexual contact must have been made "purposely" did not rise to the level of plain error. *State v. Breland*, [11th Dist.] Ashtabula App. No. 2003-A-0066, 2004-Ohio-7238, ¶ 26. The court reasoned that although the definition mentions purpose, no direct evidence of the defendant's mental state is required. *Id.* * * * "[I]t is sufficient to present circumstantial evidence from which the finder of fact can infer the purpose of the act was for sexual gratification * * *." *Id.* at ¶ 24; *Gesell*, 2006-Ohio-3621[,] at ¶ 25.

*Id.*

**{¶50}** In this case, as we have previously discussed, there was more than enough evidence from which the jury could reasonably infer that Wrasman touched K.H.'s breast and buttocks for the purpose of sexual gratification. The circumstances surrounding the touching, combined with Wrasman's exaggerated and unusual response, support a conclusion that the touching was not accidental. When the touching is viewed as intentional rather than accidental and the parts of

K.H.'s body that were touched are considered, one could readily infer that Wrasman sought to derive some sort of sexual satisfaction from touching K.H. *See Curtis* at ¶ 92; *Breland* at ¶ 26. Therefore, having considered the jury instructions as a whole and the entire record, we conclude that Wrasman has not demonstrated that there is a reasonable probability that his trial would have ended differently if his trial counsel had acted to ensure that the jury was instructed on the definition of "purpose." Consequently, Wrasman's ineffective-assistance-of-counsel claim fails.

{¶51} Wrasman's second assignment of error is overruled.

{¶52} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and ZIMMERMAN, J., concur.**

**/jlr**