[Cite as *State v. Hinsch*, 2024-Ohio-4984.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240032 |
| | | TRIAL NO.  22CRB-13659 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| JONATHAN HINSCH, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 16, 2024

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Amber H. Daniel,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Merlyn D. Shiverdecker,* for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1}  Defendant-appellant Jonathan Hinsch was convicted of attempted sexual imposition and now challenges the sufficiency and weight of the evidence in two assignments of error.

{¶2}  First, a rational trier of fact could find that the victim's testimony and a recorded phone call established that Hinsch tried to touch the victim's erogenous zone to sexually arouse or gratify himself when he moaned as he moved his hand up the victim's leg and over her buttocks through her clothes. A rational trier of fact could also find that Hinsch knew this sexual contact was offensive to the victim, Hinsch's former stepdaughter, who testified that he had been a father figure to her and that she froze when he touched her leg.

{¶3}  Second, Hinsch's conviction is not contrary to the manifest weight of the evidence because the trial court found the victim's testimony credible and that testimony is corroborated by his statements in the recorded phone call.

{¶4}  We overrule Hinsch's assignments of error and affirm his conviction.

## I.  Facts and Procedure

{¶5}  In three complaints, Hinsch was charged with three counts of sexual imposition in violation of R.C. 2907.06. The complaints allege that Hinsch had offensive sexual contact with his former stepdaughter, BB, on three days in July 2022.

### *The State's case*

{¶6}  BB testified that Hinsch has been in her life since she was two years old and married her mother when she was six years old. She thought of Hinsch as a father figure. Hinsch and BB's mother separated in 2016 and divorced around 2018. In 2022, BB moved into the top floor of Hinsch's home. Hinsch and BB agreed that, because BB

often wore headphones and startled easily, Hinsch would notify her before entering her room. At trial, she described her encounters with Hinsch in July 2022.

A. Day one: July 11

{¶7} BB described two encounters between Hinsch and BB on July 11. That afternoon, BB finished her college classes and returned to Hinsch's home. Hinsch had just returned from a trip and gave BB a hug. Hinsch remarked that he "missed being with someone" and complimented BB. BB testified that this "rubbed her the wrong way." She retired to her room and napped. She awoke to Hinsch in her room. BB had slept in her bra and underwear because her third-floor room was "very hot."

{¶8} Hinsch sat on the edge of her bed and asked for permission to rub her back. She "didn't think anything of it" because growing up, back rubs were "normal." At one point, Hinsch asked BB if he could nap with her. With BB lying face down under a blanket that covered her "lower half," Hinsch rubbed her back and asked to unhook her bra. She answered yes. Hinsch asked to take the blanket off entirely and told BB that he "didn't want to do anything sexual" with her. At this point, she sensed that things were not normal. She agreed to remove the blanket, and he started massaging her legs. Eventually, Hinsch was rubbing lotion on her "butt." Hinsch eventually asked BB to roll over, but she refused.

{¶9} To "get out of" the situation, BB told Hinsch that she needed to eat dinner. Hinsch left the room, but before BB was able to change, he returned "without warning." BB interpreted this as "an attempt to see [her] standing up." She cried, dressed, and went to dinner with Hinsch.

{¶10} The two returned home, and BB told Hinsch she had to finish her schoolwork. Yet, Hinsch entered her room and asked to rub her feet. She answered

3

yes. But during that massage, Hinsch, without permission, moved his hand up the leg of her sweatpants and "reach[ed] on the outside." BB testified that Hinsch, without permission, "went up and under, going over my butt to touch my lower back." He was "all over" the inside and outside of her thighs through her clothes. BB recalled hearing Hinsch moaning. This incident lasted somewhere around an hour, and BB told Hinsch she needed to go to bed. He questioned her, but eventually left the room.

{¶11} BB testified that she heard Hinsch moan during the massages. She testified that Hinsch remarked that she is "strong and beautiful." BB recalled that she was "lying there, staring at his mother's building from [her] window, crying silently." She also explained that Hinsch had a "scent of alcohol on him" and she felt paralyzed and "stuck." BB feared that if she did "anything he would retaliate."

B.  Day two: July 12

{¶12} The next day, BB returned to Hinsch's home and had an encounter "similar to the night before." Hinsch was rubbing her feet before his hands started to drift up her pant leg. He touched her "[f]eet, legs, and then butt and back." His hand was touching her "bare skin" until he reached her "butt and back, that was over clothes." BB recalled hearing Hinsch sigh and moan.

C.  Day three: July 13

{¶13}   On the third day, Hinsch entered BB's room, sat on her bed, and started rubbing her feet. At one point, he kissed her feet. She was wearing shorts and testified that Hinsch

> had been rubbing my feet, moving up to my legs, and then he had been going up my shorts, on the sides of my hips. And then he also had gone over the top of my shorts to reach my back, but still touching my butt.

4

He laid on my side, like cuddling me, and that's when he brushed his arm over my private region. And then that is when he would put his hands up my shorts.

{¶14} She described him brushing across the area of her shorts covering her "vaginal region." Next, he moved his hand under her shorts and rested it on her left hip. She heard "deep breathing and moaning." He did not touch the inside of her leg.

{¶15} At the time, BB was using her cell phone and photographed Hinsch's hand on her left hip. She photographed him "because [she] didn't think what he was doing was okay and [she] wanted to have proof of that." The State entered the photographs into the record.

{¶16} BB told Hinsch that she needed to shower. He asked if he could join her and wash her back. She declined and told Hinsch, "it's going to be a quick shower." The two walked down the stairs and hugged. During the hug, Hinsch grabbed her buttocks with both hands. While pulling away from Hinsch, she felt his hands grasping her hips. BB recalled that Hinsch was breathing heavily.

{¶17} In the bathroom, BB contacted her mother's fiancé. She gave Hinsch an excuse to leave his house, and Hinsch asked BB if his actions made her uncomfortable. Later that day, she returned to Hinsch's house with her mother's fiancé and retrieved her belongings. That night, she blocked Hinsch's phone number.

{¶18} BB contacted law enforcement and told officers that she initially gave Hinsch the benefit of the doubt. But by the third day everything had "got into [her] head" and she "just didn't know what to make of it." BB told officers that Hinsch was not "super normal" and had some mental-health issues, possibly schizoaffective disorder, though she did not know the legal or medical definitions of that disorder.

5

{¶19} As part of the investigation, officers arranged a phone call between BB and Hinsch "to get [Hinsch] to admit what he had done." The State played the recording at trial. During the phone call, Hinsch acknowledged that the foot rub was neither reasonable nor appropriate. He told BB that he was trying to gauge the propriety of his conduct on the first day and knew he made her feel uncomfortable, but did not grasp *how* uncomfortable he made her. He recognized that his actions on the first night were inappropriate.

### *Hinsch's defense*

{¶20} In his defense, Dr. Stuart Bassman, the psychologist who assessed Hinsch, testified as an expert witness. Dr. Bassman authored a report on Hinsch based on their interview, Hinsch's mental-health history, transcripts of Hinsch's phone call with BB, Hinsch's police interrogation, an interview with BB's mother, and BB's trial testimony. Dr. Bassman testified that his conclusions do not suggest "that [Hinsch was] not guilty by reason of insanity." Dr. Bassman concluded that Hinsch's "[c]ognitive functioning appears to be adequate," though there is "evidence of a mood disorder in the form of depression and anxiety." He explained that Hinsch "struggles with asserting appropriate limits and boundaries in relationships."

{¶21} Dr. Bassman explained that Hinsch must develop a sense of responsibility, accountability, and "how to set boundaries in relationships." Hinsch is stuck in "an adolescent stage" and struggles to distinguish between permissible and impermissible behavior. According to Dr. Bassman, Hinsch was not "thinking or acting in the manner of someone who sexually offends." He did not believe that Hinsch knew or believed Hinsch's contact with BB was sexually offensive.

{¶22} Dr. Bassman, however, concluded that Hinsch knew he went too far and understood what sexual behavior was. Dr. Bassman did not find that Hinsch did not know what he was doing with BB. And he confirmed that Hinsch said, "[w]hen he looked back, he realized that he did not assert boundaries" and "went too far" when he asked to shower with BB. Overall, Dr. Bassman's report did not address Hinsch's diminished capacity, but instead served as a recommendation for treatment.

{¶23} The trial court found Hinsch guilty of attempted sexual imposition for his actions on the first day, but not guilty of sexual imposition for his actions on the second and third days. While it did not explain its verdicts, the trial court did find that Hinsch "acted recklessly." The trial court imposed a 30-day sentence, with 29 days suspended, and designated Hinsch as a Tier I sex offender.

## II.  Law and Analysis

A. The evidence was sufficient to prove that Hinsch tried to touch BB's erogenous zone for sexual arousal and gratification, and knew it was offensive

{¶24} In his first assignment of error, Hinsch claims that the State failed to produce sufficient evidence to convict him of attempted sexual imposition because it is factually impossible for Hinsch to have attempted the offense in light of the trial court's findings and acquittals on his other charges. He also argues there is no evidence that BB found the touching offensive, that he was reckless, or that his attempt was done for the purpose of sexual arousal or gratification.

{¶25} To review the sufficiency of the evidence, we must view the evidence in a light most favorable to the State and determine whether a rational trier of fact could find that the State's evidence establishes the elements of the offense beyond a reasonable doubt. *See State v. Cole-Walker*, 2021-Ohio-1507, ¶ 7 (1st Dist.).

7

**{¶26}** Hinsch was convicted of attempted sexual imposition. Under R.C. 2923.02(A), an attempt to commit a criminal offense is a crime in and of itself. A defendant may be found guilty of attempt if the evidence shows that the person, acting with purpose or knowledge, when purpose or knowledge satisfies the underlying offense, engaged in "conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). In other words, an attempt to commit a crime has two elements: an act or omission (1) done with purpose or knowledge, that (2) "'constitutes a substantial step in a course of conduct planned to culminate in his commission of the crime.'" *State v. Elahee,* 2017-Ohio-7085, ¶ 16 (1st Dist.), quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus. An act or omission constitutes a substantial step when it reflects an intent to commit the offense, though it does not need to "be the last proximate act prior to the commission of the offense." *Id.*

**{¶27}** Sexual imposition is engaging in sexual contact with another person "know[ing] that the sexual contact is offensive to the other person . . .  or [being] reckless in that regard." R.C. 2907.06(A)(1). Sexual contact is touching another's erogenous zone, which includes the thighs and buttocks, "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**{¶28}** Hinsch argues that his conviction for attempted sexual imposition is legally impossible in this case. He maintains the evidence conclusively establishes that he touched BB's erogenous zone on all three days. He contends that because he touched BB's erogenous zone on the second and third days, the trial court's not-guilty verdicts must mean that it found that Hinsch either lacked knowledge that the sexual contact was offensive to BB or did not intend to arouse or gratify himself or BB.

8

{¶29} But this argument ignores the fact that there were two encounters between Hinsch and BB on July 11, 2022—one in the afternoon and another at night. Hinsch is correct that the evidence proved that he touched BB's erogenous zone in the afternoon. BB testified that Hinsch rubbed her thighs and buttocks when she was lying face down on her bed. But the evidence does not show that this encounter was offensive or done for purposes of sexual arousal or gratification. BB testified that back massages were common, and she testified that she "wasn't thinking anything of it because . . . he was my stepfather." Her testimony suggests that she believed Hinsch when he told her that he "didn't want to do anything sexual."

{¶30} But later that night, Hinsch asked to rub BB's feet and "started going up [her] sweatpants leg while simultaneously rubbing [her feet]." He then "went up and under, going over [her] butt to touch [her] lower back." It was on the "outside and inside" of her thighs. For sex offenses, courts must consider the circumstances surrounding the act. *See State v. Peyatt*, 2019-Ohio-3585, ¶ 18 (7th Dist.). Courts have held that repeated touches that creep towards an erogenous zone constitute a substantial step towards sexual contact. *See State v. Hinton*, 2014-Ohio-490, ¶ 21 (8th Dist.). In other words, Hinsch took a substantial step towards touching BB's erogenous zone when he moved his hand up her clothed leg and buttocks.

{¶31} Moreover, there is evidence that Hinsch tried to touch BB's erogenous zone for the purpose of arousal or gratification. *See* R.C. 2907.06(A)(1). Under R.C. 2901.22(A), purpose is "the person's specific intention to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature . . . it is the offender's specific intention to engage in conduct of that nature." The law does not require direct testimony to prove intent to cause sexual arousal or gratification.

*See State v. Wrasman,* 2020-Ohio-6887, ¶ 9 (3d Dist.), quoting *State v. Young*, 2019-Ohio-912, ¶ 47 (12th Dist.). Circumstantial evidence, including the "type, nature, and circumstances of the contact" can prove intent to cause sexual arousal or gratification. *State v. Hodgkin*, 2019-Ohio-1686, ¶ 10 (1st Dist.), quoting *State v. Mack,* 2006-Ohio-6284, ¶ 9 (1st Dist.), quoting *State v. Daniels,* 2003-Ohio-1545, ¶ 10 (1st Dist.), quoting *In re Anderson*, 116 Ohio App.3d 441, 443-444, (1st Dist. 1996).

**{¶32}** Intent to cause arousal or gratification can be inferred when no innocent explanation exists for the offender's conduct. *State v. Armstead*, 2021-Ohio-4000, ¶ 14 (1st Dist.). Here, the nature of Hinsch's touching and the circumstances surrounding it show that it was done for sexual arousal and gratification. BB testified that she heard Hinsch moaning as his hand moved up her leg. Plus, Hinsch remarked to BB during the recorded call that he moved his hand up her leg to test her boundaries.

**{¶33}** Finally, the sexual contact must also offend the victim, and the defendant must have knowledge of, or recklessly disregard, the offensive nature of the sexual contact. R.C. 2907.06(A)(1). While the trial court found that Hinsch was reckless, recklessness cannot establish an attempted crime. Consider the committee notes to R.C. 2923.02, which explain that "purposely or knowingly attempting to commit a crime is sufficient to make the attempt a separate offense if the crime attempted requires knowledge, recklessness, or negligence for its commission." Attempt requires purpose or knowledge because a person cannot attempt an unintentional act or unintended result. In other words, "a person cannot commit an attempt offense unless he or she has acted purposely or knowingly." *State v. Duffield*, 2018-Ohio-1220, ¶ 16 (9th Dist.), citing *State v. Nolan*, 2014-Ohio-4800, ¶ 7.

{¶34} But "'a trial court's judgment which is correct, but for a different reason, will be affirmed on appeal as there is no prejudice to the appellant.'" *State v. Brown,* 2008-Ohio-4649, ¶ 26 (3d Dist.). To prove that Hinsch acted knowingly, the evidence must show that he was aware that his conduct would "probably cause a certain result or . . . be of a certain nature." R.C. 2901.22(B). Knowledge can be inferred from the surrounding facts and circumstances of the sexual contact. *See State v. Hilton*, 2015-Ohio-5198, ¶ 20 (12th Dist.).

{¶35} The evidence shows that Hinsch knew his actions would offend BB. Hinsch was a father figure to BB and had been in her life since she was two years old. She testified that fear took over and she froze that night. She "couldn't move." A father figure would know, especially after his former stepdaughter froze, that moving his hands up her legs would be offensive sexual contact. Plus, Hinsch acknowledged during his phone call with BB that he crossed a boundary. While Hinsch claims that he was referring to a familial boundary, he fails to address why his actions would cross a familial boundary.

{¶36} Hinsch argues that Dr. Bassman, in his testimony and report, concluded that Hinsch has an immature perspective and intended no harm to BB. But when reviewing the sufficiency of the evidence, we "may not weigh the evidence." *State v. Howell*, 2017-Ohio-7182, ¶ 18 (1st Dist.).

{¶37} In sum, BB's testimony established that Hinsch took a substantial step toward touching her erogenous zone and Hinsch's moans and remarks to BB indicate that his purpose was sexual arousal or gratification. Hinsch's remarks, BB's response to his touch, and his role as a father figure in her life are circumstantial evidence that

Hinsch knew his sexual contact was offensive. There was sufficient evidence to convict Hinsch of sexual imposition. We overrule his first assignment of error.

B. <u>The weight of the evidence supports Hinsch's conviction</u>

{¶38}   In his second assignment of error, Hinsch claims that his conviction is against the manifest weight of the evidence. We disagree.

{¶39}   Reversing a conviction as against the manifest weight of the evidence is reserved for judgments that amount to a "manifest miscarriage of justice." *Howell*, 2017-Ohio-7182, at ¶ 19 (1st Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). To determine if Hinsch's conviction constitutes a manifest miscarriage of justice, this court must independently review the record, weigh the evidence, and consider the credibility of the witnesses. *Id.*, quoting *Thompkins* at 387. Unlike a conviction following a jury trial, reversing a conviction after a bench trial requires a simple majority of an appellate court. *See State v. Fasino*, 2015-Ohio-2265, ¶ 9 (8th Dist.), quoting *State v. Burke*, 2013-Ohio-2888, ¶ 8 (4th Dist.).

{¶40}   Hinsch argues that the evidence weighs heavily against his conviction, citing Dr. Bassman's report and testimony, Hinsch's recorded statements, and BB's testimony. He claims that the weight of the evidence shows that BB was not offended by Hinsch's touches on July 11. While he maintains that BB's actions do not support the notion that the contact was offensive, BB described feeling "frozen," as though she could not move when Hinsch moved his hand up her leg, over her buttocks, and onto her inner thigh. And Hinsch did so as a father figure to BB. Plus, Hinsch recognized that this was inappropriate in his phone call with BB. The weight of the evidence shows that Hinsch knew his contact was offensive to BB.

**{¶41}** He maintains that the weight of the evidence does not support the finding that the contact was for sexual gratification. But the nature of the contact is evident from BB's reaction. Indeed, there is no rational explanation for why, when giving a foot massage, Hinsch moved his hand to the inside of BB's thigh and over her buttocks. And he did so while moaning.

**{¶42}** The State's case turned on the testimony of BB. The trial court's verdict reveals that it found her credible, and we defer to the trial court's credibility findings. *See State v. Jones*, 2017-Ohio-5517, ¶ 22 (1st Dist.). Our review is limited to the transcripts. In contrast, the trial court can observe a witness's body language and hear her vocal inflections, which places it in a better position to evaluate the credibility of a witness. *See State v. Rasool*, 2022-Ohio-3409, ¶ 8 (1st Dist.). And significantly, BB's testimony is corroborated by Hinsch's statements during their phone call and her photographs. Moreover, Dr. Bassman's testimony and report are not inconsistent with the finding that Hinsch tried to touch BB's erogenous zone for sexual arousal or gratification, and that he knew it was offensive.

**{¶43}** Hinsch's conviction for sexual imposition is not contrary to the manifest weight of the evidence. We overrule his second assignment of error.

### III. Conclusion

**{¶44}** We overrule the two assignments of error and affirm the conviction.

Judgment affirmed.

**ZAYAS** and **CROUSE, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.