**[Cite as *State v. Mills*, 2023-Ohio-1094.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                              Court of Appeals No.  E-22-026

      Appellee                                        Trial Court No.  2021-CR-086

v.

Shad Mills                                              **DECISION AND JUDGMENT**

      Appellant                                        Decided:  March 31, 2023

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Brett F. Murner, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Shad Mills, appeals the May 13,

2022 judgment of the Erie County Court of Common Pleas, convicting him of aggravated

burglary and assault.  For the following reasons, we affirm the trial court judgment.

## I.  Background

{¶ 2} Shad Mills was indicted on charges of aggravated burglary, a violation of R.C. 2911.11(A)(1) and (B), a first-degree felony (Count 1), felonious assault, a violation of R.C. 2903.11(A)(1) and (D)(1)(a), a second-degree felony (Count 2), and a repeat violent offender specification on Count 1 under R.C. 2941.149(A).  The matter proceeded to a jury trial, where the following evidence was presented.

{¶ 3} Shad Mills and A.C. have known each other for over 30 years and have been in an on-again-off-again romantic relationship.  On November 12, 2020, Mills and his friend, Tim, were building a patio in A.C.'s backyard.  Tim left, but A.C. invited Mills to stay to watch football and eat pizza.  At some point, Mills received a call from Tim.  Mills told A.C. that Tim's car had broken down and asked if he could use A.C.'s vehicle to go get him.  A.C. agreed.

{¶ 4} At least two hours passed and Mills did not return with A.C.'s vehicle and did not answer her phone calls or text messages; A.C. became agitated.  When her teenaged daughter returned home from work, A.C. asked her to take her to Tim's house.  Mills was there.  He ran through the living room and out the door, and A.C. followed.  Mills looked like he was on drugs.  A.C. told him that she was there to get her vehicle and she told him to leave her alone.  He gave her the car keys.

{¶ 5} Around midnight on November 13, 2020, Mills and A.C. exchanged text messages.  A.C. told Mills that she did not love him anymore, did not want to be with

2.

him, and to leave her alone. Mills denied that he had done anything wrong. Nevertheless, A.C. told him that she wanted him "to get everything you have here and leave me alone." But she also said: "Don't knock on my door[.] I'm going to bed[.]" A.C. explained that what she meant was that she did not want Mills to come to her home. Mills texted A.C. that he still planned to come by her house with Tim at around 11:00 a.m. to finish up the work he was doing.

{¶ 6} A.C. fell asleep on her couch after texting with Mills. Later that morning, around 8:00 a.m., A.C. awoke to Mills standing over her. He grabbed her by the hair and ripped her off the couch. Mills flung her to the ground and repeatedly kicked her in the head with steel-toed boots that she had bought for him, and he punched her in the mouth several times. Mills told A.C.: "You're never going to leave me, bitch," "this is the last day you're gonna live," and "you'll never see your daughter again." A.C. faked an asthma attack, but Mills told her that he would not call anyone to help her.

{¶ 7} Mills took A.C. into the bathroom and put Vaseline on the cut on her head. He then let A.C. get some water and sit on the couch. Mills began scrolling through his cellphone; because he was distracted, A.C. grabbed her phone and called 9-1-1, but did not say anything to the dispatcher. Mills discovered that she called 9-1-1, took A.C.'s phone and threw it, then ran out the door. After he left, A.C. redialed 9-1-1. She also called her daughter, who was at school, and asked her to take her to the hospital.

3.

{¶ 8} Police and emergency medical services arrived at A.C.'s home. A.C. met them outside and did not allow them in her home, allegedly because she did not want to put her dogs away. She showed them the bedroom window she believed Mills must have used to enter the house. There was a beer on some chairs that were stacked in front of the window. A.C. declined to be transported to the hospital by EMS; she told first responders that her daughter was on her way to take her.

{¶ 9} At the hospital, A.C.'s scalp wound was stapled, and she received four stitches in her mouth, where her tooth had penetrated her lip; she was evaluated for a concussion. She experienced dizziness, headaches, and pain from her injuries. Her elbow also hurt. Photographs depict the laceration to her scalp, the wound to her lip, and the bruising to her arms, neck, and face. A.C. texted photos of her injuries to Mills.

{¶ 10} A.C. testified that Mills did not live with her. She insisted that she always locks her doors and Mills does not have keys to her house. She believed that Mills entered the home through the bedroom window because he and Tim were using that window to run an extension cord into the house, and she neglected to lock it.

{¶ 11} The jury found Mills guilty of aggravated burglary and the lesser-included offense of assault, a violation of R.C. 2903.13(A), a first-degree misdemeanor. Following a separate hearing, Mills was determined to be a repeat violent offender. The trial court sentenced Mills to a minimum prison term of 11 years and a maximum prison term of 16 years and 6 months on Count 1, and a definite jail term of 180 days on Count

4.

2, to be served concurrently to each other, and an additional prison term of ten years on the repeat violent offender specification, to be served before and consecutive to the sentences imposed on Counts 1 and 2. The conviction and sentence were memorialized in a judgment journalized on May 13, 2022.

{¶ 12} Mills appealed. He assigns the following errors for our review:

ASSIGNMENT OF ERROR NO. 1: THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THE SUFFICIENCY OF THE EVIDENCE, AND THE COURT ERRED IN DENYING THE DEFENDANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL[.]

ASSIGNMENT OF ERROR NO. 2: THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ADMITTING EVIDENCE AND GIVING A "CONSCIOUSNESS OF GUILT" JURY INSTRUCTION CONCERNING APPELLANTS' [sic] STATEMENT OF SUICIDAL IDEATIONS AND APOLOGIES[.]

## II.    Law and Analysis

{¶ 13} Mills's first assignment of error challenges the sufficiency and weight of the evidence, and his second assignment of error challenges one of the trial court's instructions to the jury. We consider each of Mills's assignments in turn.

5.

## A. Motion for Acquittal, Sufficiency of the Evidence, and Manifest Weight

{¶ 14} In his first assignment of error, Mills claims that the trial court erred when it denied his motion for acquittal. He also argues that there was insufficient evidence to support his conviction and his conviction was against the manifest weight of the evidence.

{¶ 15} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 16} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-

6.

8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 17} While his assignment of error is stated broadly, Mills's arguments challenge only his conviction for aggravated burglary. Even more specifically, Mills challenges only one element of the offense: trespass.

{¶ 18} Under R.C. 2911.11(A)(1), "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice * * * is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another."

{¶ 19} Mills claims that the state failed to show that he trespassed on A.C.'s property. He contends that based on the text messages between he and A.C., he was privileged to be at her home on the morning of November 13, 2020, to retrieve his property; he insists that he had property both inside and outside the house, and A.C. routinely left her side door unlocked. Additionally, Mills maintains that A.C. had invited him on the property to do work on her house. He claims that he told her he would be coming over to finish that work, and she did not object.

{¶ 20} The state responds that Mills did not have the privilege to be inside A.C.'s house on the morning of November 13, 2020. It emphasizes that he did not live with A.C. and did not have a key to her home. Although the state acknowledges that A.C. told

7.

Mills that she wanted him to pick up everything that he had at her house, she and Mills did not arrange a date and time for that to occur. The state also acknowledges that A.C. acquiesced to Mills's friend coming back to work on the house around 11:00 a.m., but it emphasizes that she specifically told Mills not to knock on her door because she was going to bed. It maintains that Mills's possessions were outside and A.C. did not invite him to come *inside* her home at 8:00 a.m., therefore, any privilege granted to Mills was limited to him entering the backyard. Instead, Mills entered her home by force through a bedroom window.

{¶ 21} The state further contends that even if Mills did have permission to be in the house on the morning of November 13, 2020, this privilege was revoked when he committed a crime inside the home. It insists that because Mills assaulted A.C. while in her home that morning, any privilege he had to be in the house was terminated.

{¶ 22} "Trespass," as pertinent here, occurs when a defendant, without privilege to do so, knowingly enters or remains on the land or premises of another. R.C. 2911.21(A)(1). A person's privilege to be on property can be limited to a certain room or area of the property. *State v. Sparent*, 8th Dist. Cuyahoga No. 96710, 2012-Ohio-586, ¶ 9 (privilege limited to certain rooms defendant was contracted to paint); *In re J.M.*, 7th Dist. Jefferson No. 12 JE 3, 2012-Ohio-5283, ¶ 12 (privilege limited to using bathroom); *State v. Rhodes*, 9th Dist. Medina No. 1769, 1989 Ohio App. LEXIS 2839, 5 (July 19, 1989) (privilege limited to first floor bathroom). If a defendant's presence at the property

8.

is initially lawful, a trespass may nonetheless occur if the defendant's privilege is revoked or terminated. *State v. Petefish*, 7th Dist. Mahoning No. 10 MA 78, 2011-Ohio-6367, ¶ 22. For example, a defendant's privilege is revoked when he commits a criminal offense inside the home. *See State v. Swiergosz*, 6th Dist. Lucas No. L-12-1293, 2013-Ohio-4625, ¶ 18.

{¶ 23} Here, A.C. testified that Mills did not live with her, he usually knocked on the front door when he visited her home, her doors were locked, Mills did not have a key, she did not want Mills to come into her home, and she told Mills not to knock on her door because she intended to go to sleep. Any permission A.C. granted for Mills to be on her property was limited to her backyard, where he and Tim had been doing work, and was not supposed to occur until 11:00 a.m.—not 8:00 a.m. Additionally, according to A.C., Mills entered the home through a bedroom window while A.C. was sleeping. While Mills may have believed that A.C. wanted him to come to her home to collect his belongings, nothing about their exchange of text messages may be interpreted as suggesting that he climb through a bedroom window to do so. Accordingly, we find that these facts, if believed, demonstrate that Mills was not privileged to enter A.C.'s home. The state presented sufficient evidence that Mills "trespassed" in her home for purposes of R.C. 2911.11(A)(1).

{¶ 24} We now turn to Mills's challenge to the weight of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the

9.

appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 25} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 26} Here, the jury heard A.C. testify and it was presented with the text messages exchanged between A.C. and Mills. The jury obviously believed A.C.'s version of events, and it did not interpret the text messages as inviting Mills to enter

10.

A.C.'s home through a bedroom window at 8:00 a.m. on November 13, 2020—an interpretation that we believe was reasonable. We cannot find that the jury clearly lost its way in resolving these evidentiary conflicts. This is not the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 27} We find Mills's first assignment of error not well-taken.

### B. The Jury Instruction

{¶ 28} In his second assignment of error, Mills challenges the trial court's decision to instruct the jury on consciousness of guilt. He acknowledges that an accused's flight, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible evidence of consciousness of guilt. He claims, however, that the behavior that prompted the court to provide the instruction here —his apologies and talk of suicide— were related to the termination of his relationship with A.C. and not evidence that Mills had committed a crime.

{¶ 29} The state responds that the instruction given by the court was a correct statement of the law and was supported by the facts of the case, and reasonable minds could conclude that Mills's apologies and talk of suicidal ideations were motivated by his consciousness of guilt. It insists that the context of the statements makes clear that they were in relation to the assault he committed on the victim on the morning of November 13, 2020. The state contends that Mills's apologies and talk of suicide qualify as "related conduct" for purposes of providing the consciousness-of-guilt instruction.

11.

**{¶ 30}** The trial court gave the following jury instruction:

Consciousness of Guilt, Apologies and Suicidal Comments. Testimony and evidence was admitted during—indicating that the Defendant made apologies and suicidal comments to [A.C.] regarding the alleged incident on November 13, 2020. You are instructed that such actions by Defendant alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness of guilt.

If you find that the facts do not support that the Defendant made apologies or suicidal comments to [A.C.] as stated above, or if you find that some other motive prompted the Defendant making apologies and suicidal comments as stated above, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the Defendant made apologies and suicidal comments to [A.C.] as stated above, and if you decide that the Defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

{¶ 31} Trial courts are charged with giving juries correct and comprehensive instructions that adequately reflect the argued issues in the given case before them. *State v. Sneed,* 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992). "Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction." *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 40, citing *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). We review the trial court's instructions to the jury for an abuse of discretion. *State v. White,* 2013-Ohio-51, 988 N.E.2d 595, ¶ 97 (6th Dist.), citing *State v. Lillo,* 6th Dist. Huron No. H-10-001, 2010-Ohio-6221, ¶ 15.

{¶ 32} "'It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, *and related conduct,* are admissible as evidence of consciousness of guilt, and thus of guilt itself.'" (Emphasis in original.) *State v. Williams,* 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997), quoting *State v. Eaton,* 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969). Ohio courts have concluded that apologies and expressions of suicidal thoughts may constitute a "consciousness of guilt." *See State v. Tvaroch*, 11th Dist. No. 2012-T-0008, 2012-Ohio-5836, 982 N.E.2d 751, ¶ 25-26; *State v. Wrasman,* 3d Dist. Auglaize No. 2-20-03, 2020-Ohio-6887, ¶ 27 (apologies and suicide threats constituted consciousness of guilt); *State v. Williams,* 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 45 (suicide

13.

attempt was evidence of consciousness of guilt); *State v. Pryor*, 5th Dist. Stark No. 2013CA00016, 2013-Ohio-5693, ¶ 34 (apologies to victim indicated consciousness of guilt); *State v. Teal,* 6th Dist. No. L-15-1280, 2017-Ohio-7202, 95 N.E.3d 1095, ¶ 59 (apology to victim demonstrated consciousness of guilt); *State v. Crawford*, 9th Dist. Lorain No. 19CA011567, 2021-Ohio-1686, ¶ 20 (apology could be viewed as consciousness of guilt).  If supported by the evidence and not misleading, this evidence may merit a consciousness-of-guilt jury instruction.  *Tvaroch* at ¶ 43.

**{¶ 33}** In *Tvaroch*, the defendant argued that there was no evidence that his apology for "what happened" had anything to do with the incident giving rise to the charges against him.  After reviewing the context of defendant's statements, the court determined that the jury could reasonably infer that defendant's apology did pertain to the incident at issue.  It, therefore, concluded that the trial court's consciousness-of-guilt instruction was supported by the facts and the trial court did not abuse its discretion in giving the instruction.  The court noted that this was especially true given that the trial court also cautioned the jury that it could completely disregard the evidence if not believed, and even if believed, (1) the evidence would not rise to a presumption of guilt, and (2) the jury was not *required* to consider that evidence in deciding defendant's guilt.

**{¶ 34}** Here, A.C. testified that after she texted Mills pictures of her injuries, Mills responded:  "Im so fucking dumb ass of me im a fucking idiot.  [sic]"  A.C. told Mills

that he embarrassed and hurt her, and he could have killed her. Mills responded, indicating that he was suicidal. He also apologized to her several times:

> This is the last call i will ever make too you im sorry for everything i hurt you. I love you in my dying days in death i still love you.
>
> * * *
>
> I caused you so much pain and suffering i hurt bad when i look at you in those fucked up pics im truly am sorry try and forgive me do not hold onto the hate it was what ate me alive.
>
> Im so hurt for you
>
> * * *
>
> The pain in your eyes that i see i can no longer deal with this shit my mind spinning out of control my thoughts coming and going i hurt the woman im so much claimed i love and who I was to protected im tired of these changes in my mind my heart loves [sic]

Screenshots of the text messages were admitted as a trial exhibit.

{¶ 35} Additionally, Mills called A.C. from the Erie County Jail on December 16, 2020. During that phone call, Mills told A.C. that he wanted to call her again. She expressed reluctance and told him that he hurt her "so bad" and could not "in good conscience" continue talking to him. Mills responded that he knew he hurt her and that he was speaking with a psychiatrist. Mills called A.C. again on December 20, 2020. He

told her: "I know that what I put you through was bullshit, but you know, and I know, that when I'm not on any drugs or anything like that, I'm a good dude." He admitted that he had gone too far. In a third phone call, also on December 20, 2020, he told A.C. that what he did was not her fault, it was because of the drugs he was on, and if he "had to sit it out a couple years, so what? I deserve that." A.C. told Mills that she has nightmares about how he had acted "because it was just so scary." Mills rationalized that perhaps someone had cut the drugs he took with fentanyl.

{¶ 36} We find that given the context of Mills's statements, a reasonable juror could find that his apologies and suicidal thoughts related to the November 13, 2020 assault. And like the court in *Tvaroch,* the trial court provided the jury cautionary instructions that the evidence cannot give rise to a presumption of guilt, it could completely disregard the evidence if it did not believe that the statements were made or did not believe the statements were motivated by the incident giving rise to the offense, and it could decline to consider the evidence even if believed.

{¶ 37} We find that the trial court did not err when it gave the consciousness-of-guilt instruction. Mills's second assignment of error is not well taken.

### III.    Conclusion

{¶ 38} The state presented evidence which, if believed, supported the "trespass" element of Mills's conviction of aggravated burglary where A.C. testified that Mills did not live with her, he usually knocked on the front door when he visited her home, her

16.

doors were locked, Mills did not have a key, she did not want Mills to come into her home, she told Mills not to knock on her door because she intended to go to sleep, and Mills entered her home through a bedroom window while she was sleeping. The jury did not lose its way in believing A.C.'s version of events and rejecting Mills's position that he was privileged to enter her home. We find Mills's first assignment of error not well-taken.

{¶ 39} A reasonable juror could have found that Mills's apologies and suicidal thoughts related to the November 13, 2020 assault. Ohio courts recognize that apologies and suicidal thoughts may constitute evidence of consciousness of guilt. Accordingly, we conclude that the trial court did not abuse its discretion when it gave the jury an instruction on consciousness-of-guilt. We find Mills's second assignment of error not well-taken.

{¶ 40} We affirm the May 13, 2022 judgment of the Erie County Court of Common Pleas. Mills is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

17.

Thomas J. Osowik, J.                       _____

                                                       JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, J.                      _____
CONCUR.                                           JUDGE

                                                         _____

                                                         JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.