[Cite as *State v. Dennison*, 2025-Ohio-139.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 24CA7 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| v. | : | |
| Charles H. Dennison, | : | **RELEASED 1/15/2025** |
| Defendant-Appellant. | : | |

_____
<u>APPEARANCES</u>:

Karyn Justice, Esq., The Law Office of Karyn Justice, LLC, Portsmouth, Ohio, for appellant.

Brigham Anderson, Prosecuting Attorney, and Philip Heald, Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.
_____
Hess, J.

{¶1} Charles H. Dennison appeals a judgment of the Lawrence County Municipal Court convicting him, following a jury trial, of three counts of sexual imposition. Dennison presents three assignments of error asserting: (1) the trial court erred when it denied him the opportunity to challenge jurors for cause, (2) his convictions are not supported by the manifest weight of sufficient evidence, and (3) his sentence is contrary to law. For the reasons which follow, we conclude that sufficient evidence supports the convictions and that the convictions are not against the manifest weight of the evidence, so we overrule the second assignment of error. However, we also conclude that the trial court erred when it denied Dennison the opportunity to challenge jurors for cause. We sustain the

first assignment of error, reverse the trial court's judgment, and remand for a new trial on the sexual imposition counts. This decision renders moot the third assignment of error asserting the sentence is contrary to law, so we need not address it.

## I. FACTS AND PROCEDURAL HISTORY

{¶2}   In September 2023, Dennison was charged via complaints with three counts of sexual imposition in violation of R.C. 2907.06(A)(4), third-degree misdemeanors, and one count of disorderly conduct in violation of R.C. 2917.11, a fourth-degree misdemeanor. On February 23, 2024, the trial court conducted a jury trial.

## A. Voir Dire

{¶3}   During voir dire, the court had 17 prospective jurors come to the jury box. The trial court sua sponte excused one who had moved out of state "for cause" and replaced her. During questioning by the parties, Juror #28[1] said that he consulted with the county prosecutor on a divorce but could be a fair and impartial juror.  Juror #33, a bus driver, said that she had probably seen the alleged victim in passing but would not have a problem rendering a verdict against her "if the evidence is pointed in that way."

{¶4}   When asked if anything in their personal lives would prevent them from returning to court the next day, Juror #40 said that her child had a competition.  Juror #23 said that she was supposed to go out of town to visit her mother. Juror #1 said that she is the sole guardian for her mother with dementia.  Juror #1 indicated someone was with her mother that day and that she had no problem returning to court the next day if seated as a juror.  But when asked if her mother's situation was of such importance that it would prevent her from fully deliberating the case and hearing and weighing the evidence, Juror

---

[1] The transcript appears to mistakenly refer to this individual by different, but similar, names.

#1 stated, "I think so because she's a runner.  If you go to the bathroom to use the bathroom, she's at the door and halfway to Sam's." Defense counsel indicated that if selected, Juror #1 would be asked to apply her full attention to the case and said, "[I]f I understand you correctly, what you're telling me is you're [sic] concern for your mother may prevent you from --."  Juror #1 stated, "Absolutely."  When asked if there was anything about the charge of sexual imposition that would prevent the prospective jurors from being fair and impartial, Juror #42 said that she adopted a child who "was in the same kind of case" and did not know that she "would be able to be fair."

{¶5}    After the parties finished their questions, the trial court asked if any of the prospective jurors felt they could not set their prior experiences aside and decide the case on the evidence.   An unidentified prospective juror said, "I feel that way," but later indicated they could decide the case based only on the evidence.  The court then sua sponte excused Juror #40 for cause.  The court addressed Juror #1, confirmed she could make arrangements to have someone watch her mother, and said, "I want to keep you on if you feel like you can do it."  The court addressed Juror #23 and stated, "[Y]ou also have a family commitment.  So I'm not really -- what's the counsels' feeling on that?"  Defense counsel stated, "We would move to excuse her."  The State had no objection, and the court stated:

> Okay.  You're letting me off the hook.  Because I'm not sure -- technically I have rules I'm supposed to follow about excusing people.  And the problem with family commitments is everybody's got one.  So everybody's got something that they should do but I'm going to excuse you to [sic], ma'am. So we're going to have -- you can leave.  So we're going to need to draw two more jurors.

{¶6}    The court then added two prospective jurors, Jurors #11 and 14, to the jury box, and gave the parties an opportunity to question them. Defense counsel primarily directed questions to Juror #14 and then stated, "Okay.  Thank you.  Nothing further.  Thank you, Judge."  The court stated, "Alright.  Pass for cause?"  Defense counsel stated, "For this particular juror, yes."  The court stated, "Okay.  Well, we have the other juror too.  So you want -- he questioned both, so."  Defense counsel stated, "I don't have any further questions at this point."  The court stated, "Okay.  Thank you, sir.  At this point then I'm going to meet with the lawyers.  We've got some things we got to do about further refining the jury pool."  The court also stated, "So I'll meet counsel in chambers now."

{¶7}    The court went off the record, and when the proceeding resumed, the court excused eight prospective jurors and swore in the jury, which included Jurors # 1, 28, 33, and 42.  The court sent them to the jury room and stated that it thought defense counsel had some things he wanted to put on the record.  Defense counsel stated:

> Thank you, Judge.  I think that the record should reflect that the Court and [assistant prosecutor] and I had a phone conference on Wednesday at 3:00 and we discussed the jury selection process. And what we discussed was that for cause challenges would be conducted outside of the presence of the jurors.  That was my understanding.  Now, we just went through jury selection.  And we only called up two jurors who I questioned.  The last of which was [Juror #14].  And the Court addressed him directly asking about if I pass for cause.  I thought that applied to [Juror #14] specifically.  And so as a result of that conversation we had Wednesday, I was waiting on that opportunity to make those for cause challenges outside of the presence of the jurors as was my understanding from our conversation Wednesday.  I attempted to do so.  We went off the record and so I just it put on the record that it [sic] did have for cause challenges, but I was prevented from doing those for cause challenges because I guess I was supposed to do that in the presence of the jurors.  And so what I ended up having to do is exhaust my preemptories [sic] on those jurors who would have been for cause.  And, for example, some of the for cause would have been [Juror #28] who had consulted with and had an attorney/client relationship with [the county prosecutor].  And we would refer to Revised Code 2313.17 subsection 5.

And [Juror #1],[2] who although said she could sit, she said that she could not give this case her undivided attention. That would have been another for cause challenge. Again we were precluded from challenging those and had to exhaust our preemptories [sic]. And we would ask now that I would be able to do that again. And I just wanted to state on the record that it had no part in my strategies. So in the event that I (unintelligible). And so I just want to say that was not my strategy to forego challenges for cause. That's it.

The court asked if the assistant prosecutor had anything he wished to say, and he stated,

"I don't know that we have a response, Your Honor, at this time." The court stated:

Well, I will just say that it was my understanding from our conversation that we would do the preemptories [sic] in chambers. And that there have been people dismissed for cause while we were in the courtroom. And I believe I asked counsel if you passed for cause, and that was my understanding you were passing for cause. So that's why it happened the way it did. And we adjourned to chambers and counsel then struck their preemptories [sic]. So -- but your objection is noted on the record.

## B. Evidence

### 1. Testimony of M.D.

{¶8} M.D., who turned 16 a few weeks before trial, testified that she lives with her foster parents, who would soon be her adoptive parents, her sister, and her foster brother. M.D. testified that she also has a brother who lived there a few months before moving to a different foster home. M.D. testified that Dennison is her "step-grandfather" but clarified he was married to her soon-to-be adoptive grandmother. For the sake of simplicity, we will refer to M.D.'s foster mother as "mother," and we will refer to M.D.'s foster grandmother as "grandmother" in this decision.

{¶9} M.D. testified that during the summer of 2022, she and her sister were in grandmother and Dennison's home office printing pictures. M.D. was sitting in the red chair at the desk on grandmother's side of the office, and Dennison was sitting in the

---

[2] Defense counsel misstated this person's name but appears to be referring to Juror #1.

other chair, which he moved from his side of the office to right beside the red chair. M.D. testified that Dennison put his hand on her knee for a while and then put his hand near her thigh, close to her inner thigh.  M.D. demonstrated what Dennison did for the jury. M.D. testified, "I hurried up and I got the pictures.  I hurried up printing out the pictures and then ran out, telling my sister I had use [sic] the restroom and asked her if she could get the printed pictures." M.D. testified that no one else was in the room when Dennison touched her and that grandmother was making dinner. M.D. testified that Dennison's conduct made her feel confused and weird in a sexual way, and she felt like he had done a sexual thing to her.  She testified that she did not say anything to him because she "was scared that he was going to get mad (unintelligible)."  M.D. testified, "He would always -- like he would get mad if I said no or like move (unintelligible), like, if he would do it."  M.D. did not tell anyone what happened at the time because she was scared.

{¶10}  During the summer of 2023, a second incident occurred at a church while M.D., Dennison, grandmother, M.D.'s sister, another male, and another female who attended the church (the "churchgoer") were preparing for a Bible school event. M.D., Dennison, and the other male were outside in front of the worship hall when M.D.'s sister came outside and asked for help moving tables. The other male went to help, leaving M.D. alone with Dennison. M.D. felt uncomfortable and started to walk inside, but Dennison grabbed her by the waist and pulled her down.  She testified that he "kept on squeezing tighter and everything and I could feel -- like he kept on moving up and down on me.  And I was on top of him.  And I could feel his private area getting hard."  M.D. told Dennison "to get off of me and stop squeezing me super hard."  She testified, "I took my

elbow and I went like that.  And he let go and I ran inside."  M.D. testified that she was not injured.  She did not tell anyone what happened at the time.

{¶11}  Next, a third incident occurred when M.D. was alone with Dennison in a vehicle traveling to a different church. M.D. was wearing shorts, and Dennison put his hand on her knee, moved it up to her thigh, under her shorts, and touched her panty line. She told him to stop, and he let go of her leg very quickly.  He told her, "I'm sorry for doing that, it's an addiction and please don't tell . . . anybody that I did this to you.  I just do it to you." M.D. denied being worried about or having any conversation about her brother during this incident.  M.D. left the church with grandmother.  When Dennison found out she was riding with grandmother, he said, "[Y]ou don't love me.  Come on.  Come drive with me."  When M.D. got home, she told her sister what happened. The next day, M.D. reported the incident to a counselor.

{¶12}  On cross-examination, M.D. testified that in June 2022, she went to the churchgoer's house to get some shoes.  The churchgoer's husband was sitting in a chair with four or five beers on the table and kept telling her "to come here, pretty, come sit with me and everything."   M.D. felt uncomfortable, grabbed the shoes, and left. She immediately reported the incident to someone.  On re-direct examination, when asked why she reported that incident and not the incidents with Dennison, M.D. testified, "Oh, [the churchgoer's husband] was like he was just talking to me and not like actually touching me sexually.  And at that time I could escape away.  But if I was with [Dennison], I couldn't really escape because he would get mad and find an excuse to not (unintelligible)."  On recross-examination, M.D. testified that the churchgoer said that her husband would never do what M.D. accused him of and that M.D. was lying.

### 2.  Testimony of M.D.'s Mother

{¶13}  M.D.'s mother testified that in grandmother's house, a portion of the office is visible from the kitchen.  But if someone was sitting behind the desk which M.D. testified was on grandmother's side of the room, the bottom half of their body would not be visible from the kitchen.

### 3.  Interview of Dennison

{¶14}  On September 13, 2023, Detective Brad Layman of the Lawrence County Sheriff's Office conducted a recorded interview of Dennison at the high school where he worked, which was played for the jury.  During the interview, Detective Layman says he is sure Dennison is "aware of the complaint."  Dennison says, "Not exactly," and "I mean I can kind of pinpoint some incidents." Dennison tells Detective Layman that he was driving with M.D., that she was sad because her brother was in a group home, that he put his hand on M.D.'s leg and said that her brother would be okay, that she went to pick her leg up, and his hand slid down almost to her crotch. Dennison says he quickly pulled away, and there was "nothing sexual about it at all."  Dennison also says that he does not remember going near M.D.'s panties, but later he admits his hand touched her panty line and then claims he is not sure.  At one point, Dennison talks about his hand going "up there" and moving as he drove, and shortly after that, he is asked how many times he thinks this happened. Dennison says "maybe three at the most" but later says at least three, though he indicates his hand did not go as high the other times. Detective Layman says, "So the one time your hand slipped and touched her panty line, and the rest of the time it was just on the inner thighs?"[3] and Dennison agrees.

---

[3] The transcript indicates the last word of this question was "things," but the recording indicates it was "thighs."

{¶15} During the interview, Detective Layman says, "I think that you felt a certain way about [M.D.] and you tried to advance that and she shut you down. Okay? And I think that -- and that's fine, that happens in life. The problem we're going to have is when you start lying about it. Because if that's what happened, then you need to tell me the truth." Dennison says, "Yeah. I don't think -- I really don't think I was trying to get further. I mean as far as sex or anything like that. I don't." Detective Layman says, "You don't think you were?" Dennison says, "I know I wasn't. I know I wasn't." Detective Layman asks if Dennison was "just testing her to see how far she would go?" Dennison says, "No. I just don't know exactly why I -- because like I said, my wife pleases me a hundred percent."

### 4. Suicide Attempt

{¶16} The State presented evidence that on September 13, 2023, Dennison's sister contacted 911 for a well-being check on him. Dennison's sister said that another brother recently died, that Dennison was taking anxiety medication which made him depressed, that Dennison had just been placed on administrative leave at work due to a molestation accusation, that his wife left, and that Dennison said he was going to take his life. A 911 dispatcher contacted Dennison, who said that he was innocent, did not want to go to jail "over something that stupid," and was not a pervert or sex offender. Dennison also said that he would "go to heaven" and was about to shoot himself. Dennison said that his wife did not believe him and that he was placed on administrative leave and may not get his job back. Deputy Matthew Chinn with the Lawrence County Sheriff's Office performed a well-being check and found Dennison in a shed with a gun in his mouth. He

disregarded multiple orders to drop the weapon. Eventually, Deputy Chinn confiscated it and charged Dennison with disorderly conduct.

### 5. Testimony of Dennison

**{¶17}** With respect to the first alleged incident, Dennison testified that he was in the office with M.D. when she was printing pictures but never got close to her, and he indicated M.D.'s grandmother would have been able to see into the office from the kitchen. Dennison also denied that the second alleged incident occurred and testified that he was never alone with M.D. during the event preparations. Dennison did recall an occasion when he was alone in a car with M.D., and she was concerned about her brother, who had been moved from a foster home to a group home. M.D. asked if he was in jail. Dennison testified, "I sent her a tap on the leg. But I said he's going to be fine. I said it's not like jail. I said, it's a little more disciplined than what it is in foster care. Just tapping her on the leg." M.D. lifted her legs up and crossed them in the seat. Dennison testified, "When she did, my hand slid -- slid down toward her shorts line. Or her panty line, I don't know. I quickly moved it. I quickly moved it." Dennison told M.D. he was sorry. He testified that he did not touch M.D. for a sexual reason and is not attracted to minors. He also testified that he was not "in the right state of mind" the day of the interview. His brother passed away about a week before, and he was sleep deprived and on nerve medications. He was placed on administrative leave and did not remember how he got home. Dennison testified that he could not believe he was going to shoot himself "over lies" and regretted even thinking about it. He did not want to go to prison for something he did not do. Dennison testified, "I did have my hand on her a couple of times driving down the road. But there was nothing sexual about it."

6. Testimony of Other Defense Witnesses

**{¶18}** The churchgoer testified that she has known Dennison for 30 or 40 years. She testified that all the kids at the church loved Dennison and that M.D. and her sister would fight over who got to ride home with him. The churchgoer never observed any inappropriate behavior by him. The churchgoer also testified that in June 2022, M.D. went to her house to pick up some shoes, claimed her husband was drunk, told her to "come closer," and made her feel uncomfortable. The churchgoer told M.D. that her husband is hard of hearing. The churchgoer reviewed footage of the incident from her surveillance cameras. Defense counsel asked, "And were you able to determine whether she was being truthful?" The churchgoer testified, "Yes." Defense counsel asked, "And was she?" The churchgoer testified, "No." The State objected. The court asked, "Do you have this to play to the jury?" Defense counsel then asked, "Do you still have any video?" and the churchgoer testified, "No." The court sustained the State's objection but did not instruct the jury to disregard the testimony about M.D. being untruthful.

**{¶19}** The Bible school teacher at the church where the second alleged incident occurred testified that she has known Dennison all his life. She testified, "He loves kids and the kids love him." She never saw any inappropriate behavior or saw M.D. with cuts or grass-stained knees at Bible school.

**{¶20}** A witness who had worked at the same school as Dennison testified that he had known Dennison for at least 25 years. The witness had observed Dennison around people under 18. He never saw anything inappropriate.

C. Verdict and Sentencing

**{¶21}** The jury found Dennison guilty of the three counts of sexual imposition and not guilty of disorderly conduct. At the sentencing hearing, the State asked for maximum sentences of 60 days in jail on the sexual imposition counts, to be served consecutively, for a total of 180 days in jail. The State also asked for two years of probation, a no-contact order, and the imposition of a Tier I sex offender registry obligation. Defense counsel asked the court to not order jail time.

**{¶22}** The trial court found the case involved "a gross violation of a position of trust" because Dennison "stood in the position of a grandfather" to M.D. and stated:

> So I'm going to go on with what the State's recommending. I will sentence Mr. Dennison under the -- because of those circumstances of violating that duty of trust, I believe it's worthy of the maximum penalty. So I'm going to sentence him to a hundred and eighty days in jail. There'll be a $500 fine on each offense. So that [sic] $1500. A no contact order. He's ordered to register as [a] Tier 1 offender.

The trial court issued a judgment entry of sentencing and registration which states that the court sentenced Dennison "to the maximum incarceration of sixty days for each [count] for a total of one hundred and eighty days and a $500.00 fine for each for a total of $1,500.00 and all court costs and registration fees." The entry also states that he must register as a Tier 1 sexual offender, "is ordered to have no contact with the victim," and "is ordered to probation with this court for two years, level 1."

## II. ASSIGNMENTS OF ERROR

**{¶23}** Dennison presents three assignments of error:

I. The trial court erred when it denied appellant the opportunity to challenge jurors for cause.

II. Appellant's convictions are not supported by the manifest weight of sufficient evidence.

III.  Appellant's sentence is contrary to law.

We will address the assignments of error out of order.

### III.  SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE

**{¶24}**  In the second assignment of error, Dennison contends his convictions are not supported by the manifest weight of sufficient evidence.  He claims the State failed to show he had sexual contact with M.D.  Dennison asserts that M.D. acknowledged that during the first alleged incident, her sister was in the office, and her grandmother was nearby, and he testified that during the second alleged incident, other people were present. However, no one substantiated M.D.'s testimony.  Dennison also claims, without citation to the record, that M.D. "agreed that she moved her leg" during the third alleged incident.  He asserts that he "testified consistently that he did not touch her for any sexual reason" and that M.D. exaggerated "the accidental movement of his hand after she adjusted her leg," just like she exaggerated what happened with the churchgoer's husband. Dennison also emphasizes the fact that M.D. delayed reporting the alleged incidents with him and asserts that he cooperated with the investigation and "was truthful." Dennison asserts that the State relied on "improper inferences" from his statements to bolster M.D.'s allegations.  And he suggests that his suicidal thoughts were not evidence of consciousness of guilt but rather stemmed from the recent loss of his brother and the fact that M.D.'s accusations had "completely upended" his life.

### A.  Standard of Review

**{¶25}**  In reviewing the sufficiency of the evidence for a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997), and following *Jackson v. Virginia*, 443 U.S. 307 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.). "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016), quoting *Jackson* at 319.

{¶26} In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence. "'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.'" *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.) *Anderson* at ¶ 14-15. "'Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional

case where the evidence weighs heavily against the decision.'" *State v. Allen*, 2022-Ohio-1180, ¶ 27 (4th Dist.), quoting *State v. Gillian*, 2018-Ohio-4983, ¶ 28 (4th Dist.), citing *State v. McKelton*, 2016-Ohio-5735, ¶ 330.

## B. Statutory Elements

{¶27} At the time of the alleged offenses, R.C. 2907.06(A)(4) stated in pertinent part: "No person shall have sexual contact with another, not the spouse of the offender[4] . . . when . . . [t]he other person . . . is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person."[5] 2018 H.B. 96 (Effective Mar. 22, 2019). There is no dispute that at the time of the offenses, M.D. was not Dennison's spouse, M.D. was 13 or older but less than 16, and Dennison was at least 18 and 4 or more years older than M.D. The dispute in this case centers on the sexual contact element.

{¶28} "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "A person acts purposely when it is the person's specific intention to cause a certain result . . . ." R.C. 2901.22(A). "'"[T]here is no requirement that there be direct testimony regarding sexual arousal or gratification."'" *State v. Peaks*, 2024-Ohio-1678, ¶ 18 (4th Dist.), quoting *State v. Wrasman*, 2020-Ohio-6887, ¶ 10 (3d Dist.), quoting *State v. Young*, 2019-Ohio-912, ¶ 47 (12th Dist.), quoting *State v. English*, 2014-Ohio-441, ¶

---

[4] Under the current version of the statute, the victim can be the spouse of the offender.
[5] R.C. 2907.26(A)(4) also prohibited causing another to have sexual contact with the offender under the same circumstances, but the jury was not instructed on that alternative.

69 (12th Dist.). "'Rather, "'[w]hether the touching was performed for the purpose of sexual arousal or gratification is a question of fact to be inferred from the type, nature, and circumstances of the contact.""'" *Id.*, quoting *Wrasman* at ¶ 10, quoting *Young* at ¶ 47, quoting *State v. Gesell*, 2006-Ohio-3621, ¶ 25 (12th Dist.).

## C.  Analysis

**{¶29}** There was evidence from which the jury could conclude that Dennison touched an erogenous zone of M.D. on three occasions for the purpose of sexually arousing or gratifying himself.  M.D. testified about three incidents with Dennison.  She testified that during the first incident, Dennison moved his chair beside hers, put his hand on her knee, and then put it near her thigh, close to her inner thigh.  She demonstrated the action for the jury, testified that it made her feel confused and weird in a sexual way, and testified that she felt like Dennison had done a sexual thing to her.  M.D. testified that during the second incident, Dennison grabbed her by the waist, pulled her down, squeezed her, and moved up and down on her while she was on top of him.  She "could feel his private area getting hard" and elbowed him to get away.  M.D. testified that during the third incident, Dennison put his hand on her knee, moved it up to her thigh, under her shorts, and touched her panty line.  She testified that he apologized, told her "it's an addiction," and asked her not to tell anyone.  During his interview, Dennison admitted to touching M.D.'s thigh area at least three times.

**{¶30}** The jury was free to believe M.D.'s testimony and reject Dennison's testimony indicating that the first and second incidents did not occur and that during the third incident, he tapped M.D. on the leg while comforting her, and his hand slid when she moved her leg.  Even though M.D. did not immediately report the incidents, she testified

about being scared after the first incident, and she reported the third incident to her sister the same day it happened. And even though no third-party corroborated M.D.'s testimony about Dennison's conduct, M.D. testified that all the incidents happened when she and Dennison were alone, though she initially testified about her sister being in the office where the first incident occurred. In addition, the jury had no obligation to find that M.D. was untruthful because she previously reported an unrelated incident with the churchgoer's husband, and the churchgoer, who was not present for the incident, testified that M.D. was untruthful based on surveillance footage not in evidence.

{¶31} Although Dennison claims that "M.D. agreed that she moved her leg" during the third incident, he does not support this assertion with a record citation, and we found no such testimony in our review of the record. Dennison gave inconsistent statements about how far his hand went. And when Detective Layman opined that Dennison "felt a certain way about" M.D. and tried to "advance that," Dennison did not immediately deny that occurred and instead said, "Yeah. I don't think -- I really don't think I was trying to get further. I mean as far as sex or anything like that. I don't." When Detective Layman then said, "You don't think you were?" Dennison seemed to realize his mistake and said, "I know I wasn't. I know I wasn't." The jury could also conclude Dennison's suicide threat indicated consciousness of guilt and was not just a reaction to his brother's death and false accusations by M.D. *See State v. Mills*, 2023-Ohio-1094, ¶ 32 (6th Dist.) ("Ohio courts have concluded that . . . expressions of suicidal thoughts may constitute a 'consciousness of guilt'").

{¶32} The State introduced evidence from which any rational trier of fact could have found the essential elements of sexual imposition proven beyond a reasonable

doubt, and in resolving conflicts in the evidence, the jury did not clearly lose its way or create such a manifest miscarriage of justice that reversal of the sexual imposition convictions is necessary.  Sufficient evidence supports the sexual imposition convictions, and the convictions were not against the manifest weight of the evidence.  Accordingly, we overrule the second assignment of error.

## IV.  JURY SELECTION

{¶33}  In the first assignment of error, Dennison contends the trial court erred when it denied him the opportunity to challenge jurors for cause.  Dennison asserts that R.C. 2313.17 lists good causes to challenge any person called as a juror and mandates that the challenges be considered as a principal challenge and that their validity be tried by the court.  He also asserts that for-cause challenges "are more than statutory provisions" because "[t]hey go to the very heart of the right to a fair and impartial jury." Dennison claims the court denied defense counsel the ability to make for-cause challenges based on a misunderstanding about the court's procedure. Dennison asserts that counsel explained that "he was told challenges for cause would be done outside the presence of the jury."  He asserts that counsel also explained that during the exchange about passing for cause, he did not intend to waive all challenges for cause. Dennison claims that because the court refused to hear defense counsel's challenges for cause, the defense was forced to exhaust its peremptory challenges, and Jurors #1 and #28, who counsel wanted to challenge and could have been removed for cause, were seated on the jury. In his reply brief, he also asserts that the court's refusal to let defense counsel make challenges for cause resulted in Jurors #33 and #42 being seated.  Dennison maintains that the court abused its discretion by denying him the opportunity to make challenges for

cause before the jury was sworn as required by statute, denied his constitutional right to an impartial jury, and committed structural error which is presumptively prejudicial.

**{¶34}** The State asserts that the trial court had discretion to set the procedure for voir dire. The State contends that "[t]he trial court's pre-trial directions on how voir dire would be conducted were clear"—"[c]hallenges for cause were to be made on the record and peremptory challenges in chambers." The State asserts that it "understood the instructions" and that it was not reversible error for the court to stay with the procedure and not change it because of defense counsel's misunderstanding. The State also asserts that "changing the rules for Appellant's benefit would have potentially prejudiced the State's challenges."

### A. Legal Principles

**{¶35}** The Sixth Amendment guarantees the right to trial "by an impartial jury" in federal criminal prosecutions. "Because 'trial by jury in criminal cases is fundamental to the American scheme of justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 551 (1976), quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). The Ohio Constitution provides that "[t]he right of trial by jury shall be inviolate," Ohio Const., art. I, § 5, and guarantees the accused "an impartial jury," Ohio Const., art. I, §10.

**{¶36}** "To safeguard this constitutional right, the General Assembly has provided for peremptory challenges and challenges for cause." *State v. Anderson*, 30 Ohio St.2d 66, 71 (1972), citing R.C. 2945.21, R.C. 2945.22 (now repealed), and R.C. 2945.25. R.C. 2313.17(B) sets forth circumstances which constitute "good causes for challenge to any person called as a juror," and R.C. 2945.25 and Crim.R. 24(C) each set forth additional

lists of causes that constitute grounds to challenge a person called as a juror in a criminal case. In addition, R.C. 2945.21(A)(1) provides that "[i]n criminal cases in which there is only one defendant, each party, in addition to the challenges for cause authorized by law, may peremptorily challenge three of the jurors in misdemeanor cases . . . ."

**{¶37}** Generally, trial courts "have wide discretion to design and direct voir dire procedures in their courts." *Crumley v. McCloud*, 2020-Ohio-2737, ¶ 9 (10th Dist.). Trial courts also have discretion in resolving challenges for cause as they involve a judgment on credibility, and the court sees and hears the jurors. *State v. Knuff*, 2024-Ohio-902, ¶ 75, citing *State v. Madison*, 2020-Ohio-3735, ¶ 42. However, R.C. 2313.17(C) provides that "[e]ach challenge listed in division (B) of this section shall be considered as a principal challenge, and its validity tried by the court." R.C. 2945.25 states that "[t]he validity of each challenge listed in this section shall be determined by the court." And Crim.R. 24(C) states that the validity of each challenge listed in that division "shall be determined by the court." In addition, R.C. 2945.26 states that "[c]hallenges for cause shall be tried by the court on the oath of the person challenged, or other evidence, and shall be made before the jury is sworn." And R.C. 2945.23 states: "Except by agreement, neither the state nor the defendant shall be required to exercise any peremptory challenge until twelve jurors have been passed for cause and are in the panel." Thus, while trial courts have discretion to establish procedures for for-cause challenges, they have no discretion to simply refuse to try the validity of challenges made before the jury is sworn or to make a defendant exercise any peremptory challenge before the requisite number of jurors have been passed for cause.

B.  Analysis

{¶38}  In this case, there was a pre-trial discussion about the court's procedure for for-cause challenges. The State claims the court gave "clear" directions that the challenges "were to made on the record." But the pre-trial discussion is not part of the record, and when given an opportunity to address the issue on the record at trial, the State did not comment. Defense counsel and the trial court indicated they had different understandings of the procedure regarding for-cause challenges--defense counsel thought they were to occur outside the presence of the prospective jurors, and the court expected them to occur in the presence of the prospective jurors.

{¶39}  Some events which occurred in the presence of the prospective jurors were consistent with the court's understanding of its procedure for for-cause challenges. For example, after the trial court sua sponte excused Juror #40, who had a family commitment, for cause, the court asked counsel about their feelings on Juror #23, who also had a family commitment. Defense counsel moved to excuse Juror #23, and the trial court granted the motion. Then after the court added Jurors #11 and 14 to the jury box, and defense counsel finished questioning Juror #14, the court asked, "Pass for cause?"

{¶40}  However, while the trial court believed that defense counsel then passed all the remaining prospective jurors for cause, it is evident from the record that counsel did not do so. When the trial court asked, "Pass for cause?" defense counsel stated, "For this particular juror, yes," indicating he was only passing the prospective juror he had most recently questioned, Juror #14, for cause. The court responded, "Okay. Well, we have the other juror too. So you want -- he questioned both, so." Defense counsel then stated, "I don't have any further questions at this point." Defense counsel did not state that he

was passing anyone else for cause, and the court did not make any further inquiry about for-cause challenges before adjourning to chambers. Once in chambers, defense counsel told the court he had for-cause challenges.

{¶41} At that point, the trial court would have been within its discretion to reconvene the jury and require that defense counsel make his for-cause challenges in the presence of the prospective jurors. Instead, the court refused to try the challenges and made defense counsel exercise his peremptory challenges even though 12 jurors had not been passed for cause. In doing so, the trial court violated R.C. 2313.17(C) because defense counsel had at least one challenge under that statute, and R.C. 2313.17(C) required that the court consider it as a principal challenge and try its validity.[6]

{¶42} "[I]f the defendant has objected to an error in the trial court, an appellate court reviews the error under the 'harmless error' standard in Crim.R. 52(A)." *State v. Perry*, 2004-Ohio-297, ¶ 15. Crim.R. 52(A) states: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "Under that rule, the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis in original.) *Perry* at ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741 (1993), and *State v. Gross*, 2002-Ohio-5524, ¶ 136. "An appellate court must reverse a conviction if the government does not satisfy this burden." *Id.* "Crim.R. 52(A) is mandatory, not permissive, and thus affords the appellate court no discretion to disregard the error." *Id.*, citing *Olano* at 735-736.

---

[6] Though not specifically cited by Dennison, we observe the court also violated R.C. 2945.26, which required that the court try challenges for cause, and R.C. 2945.23, which precluded the court from making Dennison exercise his peremptory challenges before 12 jurors had been passed for cause. It appears that Dennison did intend to cite R.C. 2945.26 but made a typographical error and cited R.C. 2945.27 instead.

**{¶43}** The State has not satisfied its burden. The State does not present this court with any argument pertinent to a harmless-error analysis. Instead, the State maintains that no error occurred.

**{¶44}** For the foregoing reasons, we conclude the trial court erred when it denied Dennison the opportunity to challenge jurors for cause. We sustain the first assignment of error, reverse Dennison's convictions, and remand for a new trial on the sexual imposition counts. This decision renders moot Dennison's constitutional argument.

## V. SENTENCING

**{¶45}** In the third assignment of error, Dennison contends that his sentence is contrary to law. However, because we have already determined that we must reverse Dennison's convictions and remand for a new trial, this assignment of error is moot, and we need not address it. *See* App.R. 12(A)(1)(c).

## VI. CONCLUSION

**{¶46}** We overrule the second assignment of error. We sustain the first assignment of error, reverse the trial court's judgment, and remand for a new trial on the sexual imposition counts. This decision renders moot the third assignment of error.

JUDGMENT REVERSED,
CAUSE REMANDED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS REVERSED, CAUSE REMANDED and that appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Municipal Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
           Michael D. Hess, Judge



**NOTICE TO COUNSEL**


**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**